Law Offices
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, New York  10178
(212) 309-6000
Attorneys for Defendant Golden Touch Transportation of NY, Inc.

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

DMITRIY SEREBRYAKOV, et al.,        :

        Plaintiffs,        :

                 :

        v.        :    12-CV-3990 (NGG)(RER)

                 :

GOLDEN TOUCH TRANSPORTATION  :   *Date of Service: January 4, 2013*
OF NY, INC., et al.,        :

                 :

        Defendants.        :

---------------------------------------------------------------x

## DECLARATION OF JOSEPHINE HERRSCHAFT IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS AND TO COMPEL ARBITRATION

    I, JOSEPHINE HERRSCHAFT, declare as follows:

    1.     I am Vice President for Defendant Golden Touch Transportation of NY, Inc.

("GTT" or "Defendant"). I submit this declaration in support of GTT's Motion to

Dismiss and to Compel Arbitration.

    2.     Defendant Konstantin Dergunov, through Mr. Dergunov's corporate entities,

defendants Double "K" USA, Corp. ("Double K") and Lokeko Inc. ("Lokeko") (Mr.

Dergunov, Double K and Lokeko, collectively the "Franchisee Defendants"), entered into

Franchise Agreements ("FAs") with GTT to operate franchises to transport customers, for

a charge, to and from the New York City metropolitan area airports and certain

surrounding areas.  The FAs set forth the terms of the Franchisee Defendants'

independent contractor relationship with GTT, including remuneration, franchise fees and

general franchise operating procedures.

3.      Mr. Dergunov currently owns and operates three franchises under three separate FAs: (i) 2003 FA between Double K and GTT; (ii) 2005 FA between Double K and GTT; and (iii) 2008 FA between Lokeko and GTT. A true and correct copy of the 2003 FA between Double K and GTT is attached hereto as Exhibit A. A true and correct copy of the 2005 FA between Double K and GTT is attached hereto as Exhibit B. A true and correct copy of the 2008 FA between Lokeko and GTT is attached hereto as Exhibit C.

4.      Other than providing access to a dispatch system, and confirming that drivers otherwise met third party licensing and/or regulatory criteria for operating a vehicle, GTT had no arrangement or relationship with the Named Plaintiffs.

5.      In the absence of the FAs, the Named Plaintiffs would not have been allowed to: (i) provide any services in the territory covered by the FA and granted by the airport authorities; (ii) use GTT's trade name and dispatch system to provide transportation services; and (iii) be subcontracted as drivers to drive the franchise vans used to provide such services.

6.      I am familiar with the facts and circumstances of this matter, and I make the representations herein based upon my personal knowledge and/or based upon documents created and kept in the normal course of business by GTT.

7.      I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing information is true and correct, based upon my knowledge, information and belief.

JOSEPHINE HERRSCHAFT

Dated: January 3, 2013

# EXHIBIT A

Franchise No.: **V50**

## FRANCHISE AGREEMENT

FRANCHISE AGREEMENT, made this twentieth day of March, 2003, by and between Golden Touch Transportation of NY, Inc., a New York corporation (the "Company"), with offices at 109-15 14th Avenue., Flushing, NY 11356 and **DOUBLE "K" USA, CORP.**, a New York corporation (hereinafter referred to as the "Franchisee"), having its principal place of business at, 302 Wingham Street, Staten Island, NY 10305.

The Company operates a two-way radio dispatch transportation service in the City of New York. The Franchisee wishes to avail itself of the services supplied by the Company's two-way radio dispatch network and to use the trade name and certain other products and services of the Company.

NOW, THEREFORE, in consideration of the mutual promises herein contained, and for other good and valuable consideration set forth herein, the parties agree as follows:

1.    The Franchise Agreement

Contemporaneously with the execution and delivery of this Franchise Agreement, and subject to the terms and conditions herein contained, the Company is selling to the Franchisee, and the Franchisee is purchasing from the Company, the right to participate in the Company's two-way radio dispatch network and to use certain other products and services in connection therewith, and the right to use the Company's trade name and two-way radios that are and will remain the property of the Company, one of which shall be installed by the Company in the Franchisee's vehicle, as described in 5.1 hereof, and the second of which shall be a portable hand held radio (both the installed radio and the portable hand held radio are referred to hereinafter collectively as the "Radios"). All of the foregoing rights are hereinafter referred to as the "Franchise." The term of this Franchise Agreement shall commence on the date following the execution hereof and shall extend to December 31, 2012 (the "Term"); however, following the expiration of the Term, this Franchise Agreement may be extended from year to year upon the prior written consent of the Franchisee and the Company. The Company authorizes the Franchisee to use the Company's trade/service mark only for so long as the Franchise Agreement remains in full force and effect. The Franchisee has no property right in or contractual right to the continued use of the name and mark in the event that the Company elects to alter the name and/or the mark, provided, however, that any alteration of the name and/or mark shall apply to all Franchisees.

2.    Type of Franchise

The Company hereby agrees to sell and the Franchisee hereby agrees to buy for the price indicated the Franchise offered by the Company as set forth below:

(initial one of the following)

| | | |
|---|---|---|
| Minibus Franchise: | $40,000.00 | (   ) |
| Van-Stretch Limo Franchise: | $35,000.00 | ( ✗ ) |
| Sedan Franchise: | $25,000.00 | (   ) |

**OR**   Check here if franchisee is purchasing from an existing franchise holder pursuant to the terms in the Contract of Sale of even date                (   )

3.    Consideration

In full consideration of the aforesaid sale, including, without limitation, the installation, license and use of the Radios, the Franchisee is delivering to the Company contemporaneously herewith:

i.    a Franchise fee of $ N/A (the "Franchise Fee"), payable by (a) certified or bank cashier's check to the order of the Company in the amount of $ N/A , and (b) a promissory note (the "Note") to the order of the Company in the principal amount of $ /with a term not to exceed four years and bearing interest at the rate of / percent per year, and related agreements in the forms annexed hereto as Attachments 1 and 2; and

(ii)    a weekly fee (the "Weekly Fee") of $41.50 which fee will be applied to the Weekly Fee in respect of the first week following the installation by the Company of the Radio in the Franchisee's vehicle.

4.    The Weekly Fee

The Weekly Fee is payable by the Franchisee weekly, in advance, commencing on the first Friday following the installation of the installed Radio in the Franchisee's vehicle, whether or not the Franchisee, or any other authorized person or entity, actually uses the Franchise, for each week following the installation of the installed Radio in the Franchisee's vehicle so long as the Company is operating its radio dispatch network. Notwithstanding the foregoing, in the event of a strike, interruption of the Company's telephone service, act of God, governmental act prohibiting, suspending or otherwise interfering with the Company's radio operations or any other event or occurrence beyond the Company's control, which event or occurrence continues for a period in excess of 48 hours, the Franchisee shall be entitled to a *pro rata* reduction of the Weekly Fee for the duration of such event beyond such 48 hour period.

4.1.   Weekly Fee Increases.  On the December 1st immediately subsequent to the execution of this Franchise Agreement, and on each subsequent December 1st, the Company may increase the Weekly Fee to the Franchisee by an amount not to exceed 20% of the then current Weekly Fee.  In addition, in the event, as a result of local, state or federal law, rule or regulation, additional fees or expenses are charged to the Company in connection with the operation of its business, such additional fees or expenses shall be added to and become a part of the Weekly Fee. Such additions to the Weekly Fee will not limit the Company from raising the Weekly Fee by up to 20% of the amount of the then current Weekly Fee on each December 1st subsequent to the execution of this Agreement.

5.   Agreements of the Company

The Company covenants and agrees with the Franchisee as follows:

5.1.   Installation and Maintenance of the Radio.  The Company shall install a Radio in good working order in the Franchisee's vehicle and deliver a portable hand-held Radio to the Franchisee.  The Radios will be compatible with the Company's dispatch network and will enable the Franchisee to receive communications from the Company's radio dispatch headquarters.  The Company will provide normal maintenance of the Radios; however, such maintenance will not include repairs and servicing required as a result of damage (including, without limitation, water damage) to the Radios, whether caused by accident, negligence, misuse, or breach of this Franchise Agreement.  All repairs and servicing required as a result of any such accident, negligence, misuse, or breach of this Franchise Agreement, including without limitation, removal and reinstallation of the installed Radio, will be at the Franchisee's sole cost and expense and will be performed at a service center designated in writing by the Company as a duly authorized service center.

5.2.   Maintenance of Radio Dispatch Network.  The Company will maintain a radio dispatch network providing continuous uninterrupted service for customers who call the Company's dispatch headquarters.  The Company will provide to the Franchisee radio dispatches indicating the location of fares to be picked up by the Franchisee and will use its best efforts to maintain a system that provides the Franchisee, together with all other Franchisees, an approximately equal opportunity to answer such radio dispatches, all as set forth in the Company's manual of rules and regulations, as the same may be amended from time to time (the "Manual"), a copy of which is annexed hereto as Exhibit 5.

5.3.   Interruption of Services.  In the event of a strike, interruption of the Company's telephone service, act of God, governmental act prohibiting, suspending or otherwise interfering with the Company's radio operations, or any other event or occurrence beyond the Company's control, the Company shall be excused from performing its obligations under this Agreement for the duration of such event and until its radio dispatch services may reasonably resume.

6.   Agreements of the Franchisee

The Franchisee covenants and agrees with the Company as follows:

6.1.   Franchisee a Corporation.   Franchisee must be a corporation formed and existing and in good standing at all times under the laws of the State of New York.

6.2.   Use of the Franchise; Transfer of the Radio.   No other entity, including without limitation, any person, partnership or corporation, will use the Franchisee's Franchise, including, without limitation, the Radios and any other services provided to the Franchisee hereunder, and the installed Radio shall not be removed or transferred to any other vehicle, whether or not such vehicle is owned by the Franchisee, without the prior written consent of the Company. Any driver of a Franchisee's vehicle who is not the owner of record of a controlling interest in Franchisee must be authorized in writing by the Company prior to using the Radios or the services of the Company. The Company's approval and authorization of a driver, other than the controlling stockholder of the Franchisee, shall be made at the Company's sole and unreviewable discretion and may be conditioned upon such terms and conditions, including without limitation, a requirement that such driver, at his own cost and expense, undergo the Company's screening process and attend the Company's compulsory training program, as the Company deems appropriate. The Company reserves the right to revoke its approval and authorization of any driver, other than the controlling stockholder of Franchisee, at any time, in its sole and unreviewable discretion. Upon termination of this Franchise Agreement, whether by default, assignment of the Franchise, or otherwise, the Radios, which the Franchisee acknowledges are and at all times will remain the property of the Company, will be returned to the Company and the installed Radio will be removed from the Franchisee's vehicle at the sole cost and expense of the Franchisee, and if the Franchise and the installed Radios are to be transferred to another vehicle, the Franchisee will bear the cost and expense of the removal and reinstallation of the installed Radio. In addition, the Franchisee will not pledge, mortgage, grant a security interest in, or otherwise encumber, the Radios.

6.3.   Assignment of Franchise Agreement.   (a) The Company will agree with a lender that provides financing for the Franchisee's vehicle that in the event of a default by the Franchisee of its obligations to such lender, the Company will consent to an assignment of the Franchise (and the underlying right to use the Radio) at such lender's request; provided, that such assignee is satisfactory to the Company.

(b) Except as provided in Subsection (a) above, neither the Franchisee, nor its successor or assigns, shall assign this Franchise Agreement without the prior written consent of the Company. Upon any assignment by the Franchisee, the Franchisee will pay to the Company a Transfer Fee which shall be determined by the type of Franchise owned by the Franchisee; the fee for a Minibus Franchise is $6000; the fee for a Van-Stretch Limo Franchise is $5000; the fee for a Sedan Franchise is $4000; plus any amounts then due to the Company from the Franchisee, whether owed in respect of the Weekly Fee or the Service fee (as hereinafter defined), due under the Note, or otherwise, and will reimburse the Company for all expenses paid or incurred by the Company in connection with the transfer of the Franchise, including, without limitation, expenses in connection with the Company's review of prospective assignees, costs of investigation, credit evaluation and training. Any assignment to which the Company consents may be conditioned by the Company upon such additional terms and conditions as the Company may deem appropriate.

(c)   The issued and outstanding shares of the Franchisee's stock shall not be sold,

assigned, pledged, mortgaged or transferred, nor shall there by an issuance of securities, such that the effective control of the Franchisee is changed without, in each instance, the prior written consent of the Company. The Company's consent shall not be unreasonably withheld or delayed, but any such change in control shall be subject to the provisions of Section 6.3(b) of this Franchise Agreement which shall apply to any and all such transactions.

(d)     The Franchisee shall furnish to the Company, upon the execution of this Franchise Agreement, a certified list in the form annexed hereto as Attachment 3, of all of its stockholders of record and all persons having beneficial ownership of a Franchisee's shares of stock indicating their share holdings, as well as a list of the directors and officers of the Franchisee. The Franchisee shall promptly advise the Company in writing of any change in the stockholders, beneficial owners, directors and officers from time to time.

(e)     All officers, directors and shareholders of the Franchisee shall execute a personal guaranty of Franchisee's obligations to the Company under this Franchise Agreement and under the Note in connection with the purchase of the Franchise. The form of guarantee is annexed hereto as Attachment 4.

(f)     The articles of incorporation and by-laws of Franchisee and any successor shall recite that the issuance or transfer of any stock therein is restricted by the terms of an agreement and all issued and outstanding stock certificates of Franchisee shall bear the following legend:

"This certificate may not be transferred or pledged without the prior written consent of Golden Touch Transportation of NY, Inc."

(g)     In the event of the death or incapacity of a stockholder of Franchisee, his or her heirs or personal representatives can succeed as a stockholder upon notice to the Company, but neither the Company's approval nor a transfer fee shall be required.

6.4.     Insurance; Risk of Loss. From and after the date of installation of an installed Radio in the Franchisee's vehicle and the delivery of a portable hand-held radio to Franchisee, the Franchisee shall maintain insurance coverage on the Radios under an all-risk policy in the minimum face amount of $3,000 and liability coverage with respect to the operation of the Franchisee's vehicle in the amount of $5,000,000.00, or such lesser amount that the Company may approve in writing. The Franchisee assumes all risks for any and all loss or damage to the Radios, including, without limitation, loss or damage caused by fire, theft, collision or water, whether or not such loss or damage is caused by the Franchisee's negligence. In addition, Franchisee shall be responsible for maintaining workers' compensation insurance coverage and such other insurance as is or may be required by law.

6.5.     Rules and Regulations. The Franchisee will abide by all rules and regulations set forth in the Company's Manual, as the same may be amended from time to time.

6.6.     Fines; Penalties and Liabilities. The Franchisee will bear the sole cost and expense for any and all fines, penalties or liabilities which may be assessed by reason of any action,

inaction or conduct of the Franchisee, or any employee, lessee, agent, contractor or any other person, corporation or entity using the Radios licensed hereunder. The Franchisee authorizes the Company to deduct from the Franchisee's voucher checks the amount of any fine assessed by the Security Committee against the Franchisee or any employee, lessee, agent, contractor or any other person, corporation or entity using the Radios licensed hereunder.

6.7.   Customer Vouchers.   Upon receipt of a voucher from a charge account customer, the Franchisee, his employees, lessees or agents, will submit such voucher for payment to the Company or, if the Company so directs, to the Company's designated agent, within 72 hours of Franchisee's receipt thereof. Each voucher payment made to the Franchisee shall be subject to the following fees (the "Service Fee"):

(a)   Thirty Five (35%) percent of the face amount of the voucher (exclusive of amounts representing tolls) on all contractual work with airlines to transport airline crews; and

(b)   Fifty (50%) percent of the face amount of the voucher (exclusive of amounts representing tolls) for all airline work to transport non crew customers of the airline and for all non airline customer accounts; and

(c)   All vouchers submitted by a specified day each week will be paid within two weeks from the specified submission date.

The Company reserves the right to increase the Service Fee, if one or more local, state or federal laws, rules or regulations, result in additional fees or expenses charged to the Company, or to its designated agent, as the case may be, in connection with the operation of its or their business. The Company also reserves the right to increase the Service Fee, on the December 1st immediately subsequent to the execution of this Franchise Agreement and on each December 1st thereafter, provided, that no such increase may exceed the preceding year's Service Fee by more than 10%.

6.8.   Internal Fare Schedules.   The Company shall have the right, with the consent of the Franchisees to establish an internal tariff or fare schedule pursuant to which all vouchers shall be priced for the purpose of determining the Section 6.7 Service Fee. An internal tariff or fare schedule may be established hereunder in the same manner and in accordance with the provisions for amending this Franchise Agreement as set forth in Section 14 (b) hereof. This internal tariff or fare schedule shall be independent of tariffs or fares pursuant to which invoices are prepared for customers of the Company.

6.9.   Changes in Fares.   The Company shall have the right and full discretion from time to time to establish, alter, amend, increase or decrease tariffs or fares quoted to customers of the Company and used internally in the absence of the establishment of an internal tariff or fare schedule under Section 6.8 hereof. If an internal tariff or fare schedule is so established, then the Company's right and discretion hereunder shall extend only to tariffs or fares quoted to customers of the Company.

6.10.   Finders Fees and Brokers Commissions.   From time to time, the Company is

required to pay finders fees or brokers commissions to persons unaffiliated with the Company in order to procure customers. In the event a finders fee or brokers commission is paid by the Company, such fee shall be deducted from the face amount of each voucher to which such fee or commission is applicable and the Service Fee shall be calculated on the basis of such reduced amount and the Franchisee shall receive the balance. By way of example, if (i) an agreement with a customer calls for payment of $100 for service provided by a Franchisee; (ii) a toll of $3.50 is incurred in connection with performance of the service; (iii) service performed for such customer is subject to a finders fee of 10%; and (iii) the service performed authorizes the Company to take a 50% Service Fee; then the Franchisee will be entitled to payment of $48.50 for the voucher presented ($45.00 plus the toll) and the Company $45.00. This provisions shall apply only when an internal tariff or fare schedule under Section 6.8 has not been established.

6.11. <u>Cellular Telephones</u>. In the event the Franchisee provides the personnel of a customer with the use of a cellular telephone or other means of communication, the Franchisee shall note on the voucher the amount of telephone time used by the such personnel. The Company, or its designated agent, will pay the Franchisee for such telephone time, subject to a service fee of ten (10%) percent.

6.12. <u>Maintenance of Vehicle and Quality of Service</u>. In addition to the rules and regulations set forth in the Manual, the Franchisee will at all times maintain a clean vehicle in good operating condition which shall be no more than three model years old, and offer customers referred by the Company courteous and efficient service. Any violation of this requirement, as evidenced by a customer complaint or a visual inspection of the vehicle, shall constitute a material breach of this Franchise Agreement and shall entitle the Company to terminate this Franchise Agreement upon ten days' prior written notice to the Franchisee.

6.13. <u>Non-Competition</u>. From the date of this Franchise Agreement until the first anniversary of the termination or assignment of this Franchise Agreement, neither the Franchisee nor any of its officers, directors or stockholders will communicate with or offer transportation services to any party that is presently a customer of the Company or that becomes a customer of the Company prior to the termination or assignment of this Franchise Agreement. The Franchisee, its officers, directors and stockholders, each acknowledge that the remedy at law for a breach of this Agreement as set forth in this Section 6.13 would be wholly inadequate, and therefore, the Company shall be entitled to preliminary and permanent injunctive relief and specific performance of the agreement herein contained and shall not be required to post a bond. This Section 6.13 constitutes an independent and separable agreement of the Franchisee, its officers, directors and stockholders, and shall be enforceable notwithstanding any rights or remedies that the Company may have under any other provisions of this Franchise Agreement, or otherwise. If any or all of the provisions of this Section 6.13 are held to be unenforceable for any reason whatsoever, it shall not in any way invalidate or affect the remainder of this Franchise Agreement which shall remain in full force and effect.

7. <u>Independent Contractor</u>

The Franchisee is and shall remain an independent contractor and shall not be deemed to be

an employee, partner, co-venturer, or agent of the Company. The Franchisee shall at all times be free from the control or direction of the Company in the operation of the Franchisee's vehicle, and the Company shall not supervise or direct the services to be performed by the Franchisee, except as specifically otherwise set forth herein. Franchisee shall be responsible for complying with applicable governmental regulations and for paying its drivers, lessees and agents. Without in any way limiting its obligations, Franchisee shall be responsible for maintaining workers' compensation insurance coverage and such other insurance as is or may be required by law.

8.   Training Program

Before commencement of the use of the Franchise, a representative of the Franchisee shall attend a compulsory training program of approximately 8 hours, which together with additional training, may take up to 16 hours. The training program will be taught to Franchisee's representative, at a cost of $250 per representative, by the Company's personnel, once per week at the Company's radio dispatch headquarters. The Company may also require each representative to attend a two-day training seminar at a cost of $100 per person. In addition, a representative of Franchisee will be required to attend at least two special annual meetings of the Franchisees (or more, if necessary) at which the Franchisee will be informed of any new rules or modifications to existing rules with respect to Franchisee conduct, innovations or proposals for changes in equipment, and general issues and problems affecting subscribers as a group. A representative of Franchisee will also be required to attend at least two discussion groups per year, at which small groups of Franchisees will meet with representatives of the Company's management to review and refresh their understanding of the Company's rules and regulations and to discuss certain targeted problems.

9.   Indemnification

The Franchisee shall indemnify and hold harmless the Company and each of its officers and directors (together the "Indemnified Parties" and individually each, an "Indemnified Party") from and against and in respect of any and all damage, loss, liability, cost and expense (including, without limitation, fees of counsel), resulting or arising from or incurred in connection with:

(a)   Any misrepresentation, breach of warranty or nonfulfillment or non-performance of any agreement, covenant, term or condition on the part of the Franchisee, its lessees, employees or agents under this Franchise Agreement, and the Franchisee agrees to pay to the Indemnified Party the amount which would then be required to put such Indemnified Party in the position that it or he would have been in had such representation or warranty been true, correct and complete, or had such agreement, term or condition been performed, complied with or fulfilled; and

(b)   Any and all actions, suits, proceedings demands, assessments, judgments, cost or expenses (including, without limitation, the fees of counsel) relating to any of the foregoing.

10.   Termination of the Franchise Agreement by the Franchisee

The Franchisee may terminate this Franchise Agreement in the event of a material

Agreement by the Franchisee following a material breach of, or default under, this Franchise Agreement by the Company, the Franchisee shall be entitled to receive from the Company an amount determined by multiplying (x) the difference between the number of years constituting the full term of this Franchise Agreement not to exceed twenty, and the number of full years of the Term that elapsed prior to termination of this Franchise Agreement by the Franchisee, by (y) a fraction, the numerator of which is the Franchise Fee and the denominator of which is the full term of this Franchise Agreement, not to exceed twenty years. The amount, if any, so determined shall constitute the sole damages to which the Franchisee shall be entitled as a result of a material breach of, or default under, this Franchise Agreement by the Company. The Company shall be entitled to offset any amount owed to the Franchisee under this Section by any principal and interest then remaining owing under the Note.

(b)     Upon termination of this Franchise Agreement following a breach or default by the Franchisee, the Company shall be entitled to retain the Franchise Fee and in addition shall be entitled to damages, which shall include, without limitation, the following:

(i)     Weekly Fees for each week that the Radios remain in the possession of the Franchisee;

(ii)     Any costs incurred or paid in connection with the removal, repair, and reinstallation and or replacement of the installed Radio or the portable hand-held Radio; and

(iii)     Reasonable expenses, including, without limitation, attorneys' fees, disbursements and court costs incurred or paid in connection with the termination of the Franchise Agreement and the recovery, removal, reinstallation, and or replacement of the Radios.

(c)     Upon termination of this Franchise Agreement following a breach or default by the Franchisee, the Franchisee shall continue to be obligated: under Section 6.2 hereof to return the Radio to the Company; under Section 6.13 not to offer transportation services to the Company's customers; under Section 9 to indemnify and hold the Company harmless; under Sections 3 and 6.6 to continue payments, if any, due to the Company.  In addition to the foregoing continuing obligations, the Franchisee will continue to be obligated to pay all monies due to the Company irrespective of the reason therefor and shall be required to remove all logos and service marks bearing the words "Golden Touch" or other proprietary logo or mark of the Company.

13.     Notices.     All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given when personally delivered or mailed by registered or certified mail, to the addresses herein designated, or at such other address as may be designated by notice to the other party. If to the Franchisee, at the address given in the prefatory Section of this Agreement; and if to the Company, Golden Touch Transportation of NY, Inc., 109-15 14th Avenue, Flushing, New York 11354, Attn: Thomas Herrschaft, with copies to: Fox Horan & Camerini LLP, 825 Third Avenue, 11th Floor, New York, New York 10022, Attn: Wayne I. Baden, Esq.

14.     Amendments and Entire Agreement.

(a)     This Franchise Agreement contains the entire agreement between the parties hereto with respect to the transactions contemplated hereby and supersedes all prior understandings, representations, warranties, promises and undertakings made orally or in writing between the parties.

(b)     All Franchise Agreements may be amended upon the consent of the Company and the consent of a majority of Franchisees who have submitted vouchers to the Company or its agents within the twelve month period prior to the delivery of notice of the Company's or the Franchisees' intention to amend all Franchise Agreements. Such consents may be in writing or may be given at a meeting of Franchisees called on proper notice given at least ten (10) days prior to such meeting.   Such meetings shall be held in the City of New York.   Each amendment properly consented to shall be binding on all Franchisees even if they did not consent thereto.

(c)     This Franchise Agreement may also be changed or modified by a written instrument executed by the parties hereto.

15.    _Parties in Interest_.  This Franchise Agreement shall inure to the benefit of and be binding upon the parties named herein and their respective successors and assigns; provided, any assignment by the Franchisor is made pursuant to the terms and conditions set forth in this Franchise Agreement. In the event of the death or incapacity of a shareholder of the Franchise, an individual, this Franchise Agreement shall inure to the benefit of the shareholder's heirs or personal representatives pursuant to the terms and conditions set forth in this Franchise Agreement.

16.    _Law to Govern_.  This Franchise Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to conflict of laws and rules.

17.    _No Waiver, Cumulative Remedies_. No failure or delay on the part of any party hereto in exercising any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power or remedy preclude any other further exercise thereof or the exercise of any other right, power or remedy hereunder.  The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law.

18.    _Severability_. If any part of this Franchise Agreement is found to be contrary to public policy or declared invalid for any reason such a finding or declaration shall not invalidate any other part of this Franchise Agreement.

19.    _Section and Other Heading_.   The section and other headings contained in this Franchise Agreement are for reference purposes only and shall not affect the interpretation or meaning of this Franchise Agreement.

20.    _Arbitration In Certain Circumstances_.  The sole and exclusive method of resolving any claim or controversy whatsoever between the parties herein or between the Company and the driver of Franchisee, unless otherwise specified in this agreement or in any other written agreement between the parties, shall be binding arbitration according to the procedures set forth in this section. Disputes which shall be subject to binding arbitration shall include but shall not be limited to: (i) the

amount of payment for or deduction from Franchisee's or Franchisee's driver's voucher payments; (ii) any monetary fine assessed against a Franchisee or Franchisee's driver pursuant to Rules and Regulations promulgated under the Franchise Agreement or related Contract for Service Agreement or (iii) any claim for discrimination of work offered to Franchisee or Franchisee's driver. The procedure to be followed by the Franchisee or Franchisee's driver with respect to any controversy set forth in subsection (i), (ii) or (iii) of this paragraph shall be the following: in each instance, Franchisee or Franchisee's driver shall first submit such claim or controversy to Director of Franchise Relations of the Company and if the aggrieved Franchisee or Franchisee's driver is not satisfied by the decision of the Director of Franchise Relations of the Company, then Franchisee or Franchisee's driver shall submit the same to binding arbitration conducted by a single arbitrator and administered by the American Arbitration Association under its Commercial Arbitration Rules, or by such other independent and impartial organization as may be designated by the Company, and the determination rendered by the arbitrator shall be final and may be entered in any court having jurisdiction over the parties. In any claim or controversy not within the scope of subsection (i), (ii) or (iii) of this paragraph, submission to the Director of Franchise Relations of the Company shall not be required. In any arbitration hereunder each party shall bear its own expenses, including legal fees; provided, however, that in the event Franchisee or Franchisee's driver recovers more than two-thirds of the amount in controversy, the Company shall reimburse Franchisee's or Franchisee's driver's filing fees but no other expenses or fees. An arbitrator shall have the authority to award compensatory damages only. This section shall not apply to any claim or cause brought by the Company to enforce a non-competition agreement between the parties herein or between the Company and a driver of Franchisee, or to any termination of this Agreement, or to any suspensions of an individual's right to operate the Franchise as a driver. Each claim or controversy required to be arbitrated pursuant to this provision must be submitted in writing first to the Director of Franchise Relations of the Company within 60 days after the date the claim or controversy arose (if such submission is required), and must be submitted to arbitration in accordance with the applicable arbitration rules within one hundred and eighty (180) days after the date the Director of Franchise Relations of the Company renders his final determination on such claim or controversy or within 180 days from the date the claim or controversy arose if submission to the Director of Franchise Relations of the Company is not required by this section. These limitations on the time for submitting claims and controversies shall be applicable to such claims and controversies notwithstanding any longer period that may be provided by statute or the Commercial Arbitration Rules, and failure to submit such claims and controversies in a timely manner shall be a complete bar to such claims or controversies. The Arbitrator shall decide any controversy hereunder in accordance with: the terms of this Agreement, the rules promulgated by the Company, and the substantive law of the State of New York

21. <u>Waiver of Trial By Jury</u>. To the extent permitted by law, the respective parties hereto hereby waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Franchise Agreement or breach thereof for any claim of damage resulting from any act or omission of the parties in any way connected with this Franchise Agreement.

22. <u>Assignment by the Company</u>. The Company shall have the right, in its sole discretion, to assign the Franchise Agreement or all or any of its obligations and rights thereunder

provided that the assignee of the Company's obligations under such assignment is, in the Company's reasonable judgment, able to perform the Company's obligations under this Agreement. Upon such assignment, the Company shall have no further liability to Franchisee for the obligations assigned.

IN WITNESS WHEREOF, the parties hereto have caused this Franchise Agreement to be duly executed as of the day and year first written above.

GOLDEN TOUCH TRANSPORTATION OF NY, INC.

BY:_____

DOUBLE "K" USA, CORP., FRANCHISEE

BY:_____
                                    Konstantin Dergunov, President

# EXHIBIT B

Franchise No.: V38

## FRANCHISE AGREEMENT

FRANCHISE AGREEMENT, made this seventh day of April, 2005, by and between Golden Touch Transportation of NY, Inc., a New York corporation (the "Company"), with offices at 109-15 14th Avenue., Flushing, NY 11356 and **DOUBLE "K" USA, CORP.**, a New York corporation (hereinafter referred to as the "Franchisee"), having its principal place of business at, 302 Wingham Street, Staten Island, NY 10305.

The Company operates a two-way radio dispatch transportation service in the City of New York. The Franchisee wishes to avail itself of the services supplied by the Company's two-way radio dispatch network and to use the trade name and certain other products and services of the Company.

NOW, THEREFORE, in consideration of the mutual promises herein contained, and for other good and valuable consideration set forth herein, the parties agree as follows:

1.      The Franchise Agreement

Contemporaneously with the execution and delivery of this Franchise Agreement, and subject to the terms and conditions herein contained, the Company is selling to the Franchisee, and the Franchisee is purchasing from the Company, the right to participate in the Company's two-way radio dispatch network and to use certain other products and services in connection therewith, and the right to use the Company's trade name and two-way radios that are and will remain the property of the Company, one of which shall be installed by the Company in the Franchisee's vehicle, as described in 5.1 hereof, and the second of which shall be a portable hand held radio (both the installed radio and the portable hand held radio are referred to hereinafter collectively as the "Radios"). All of the foregoing rights are hereinafter referred to as the "Franchise." The term of this Franchise Agreement shall commence on the date following the execution hereof and shall extend to December 31, 2012 (the "Term"); however, following the expiration of the Term, this Franchise Agreement may be extended from year to year upon the prior written consent of the Franchisee and the Company.  The Company authorizes the Franchisee to use the Company's trade/service mark only for so long as the Franchise Agreement remains in full force and effect.  The Franchisee has no property right in or contractual right to the continued use of the name and mark in the event that the Company elects to alter the name and/or the mark, provided, however, that any alteration of the name and/or mark shall apply to all Franchisees.

2.      Type of Franchise

The Company hereby agrees to sell and the Franchisee hereby agrees to buy for the price indicated the Franchise offered by the Company as set forth below:

(initial <u>one</u> of the following)

| | | |
|---|---|---|
| Minibus Franchise: | $25,000.00 | ( ) |
| Van-Stretch Limo Franchise: | $25,000.00 | ( ✗ ) |
| Sedan Franchise: | $15,000.00 | ( ) |

**OR**   Check here if franchisee is purchasing from an existing franchise holder pursuant to the terms in the Contract of Sale of even date                 ( )

3.   <u>Consideration</u>

In full consideration of the aforesaid sale, including, without limitation, the installation, license and use of the Radios, the Franchisee is delivering to the Company contemporaneously herewith:

(i)   a Franchise fee of $ _N/A_ (the "Franchise Fee"), for which a down payment has been received in the amount of $ _N/A_ and the balance is payable by (a) certified or bank cashier's check to the order of the Company in the amount of $ _N/A_, and (b) a promissory note (the "Note") to the order of the Company in the principal amount of $0 with a term not to exceed four years and bearing interest at the rate of _0_ percent per year, and related agreements in the forms annexed hereto as Attachments 1 and 2; and

(ii)   a weekly fee (the "Weekly Fee") of $53.50 which fee will be applied to the Weekly Fee in respect of the first week following the installation by the Company of the Radio in the Franchisee's vehicle.

4.   <u>The Weekly Fee</u>

The Weekly Fee is payable by the Franchisee weekly, in advance, commencing on the first Friday following the installation of the installed Radio in the Franchisee's vehicle, whether or not the Franchisee, or any other authorized person or entity, actually uses the Franchise, for each week following the installation of the installed Radio in the Franchisee's vehicle so long as the Company is operating its radio dispatch network. Notwithstanding the foregoing, in the event of a strike, interruption of the Company's telephone service, act of God, governmental act prohibiting, suspending or otherwise interfering with the Company's radio operations or any other event or occurrence beyond the Company's control, which event or occurrence continues for a period in excess of 48 hours, the Franchisee shall be entitled to a *pro rata* reduction of the Weekly Fee for the duration of such event beyond such 48 hour period.

4.1.   <u>Weekly Fee Increases</u>.  On the December 1st immediately subsequent to the execution of this Franchise Agreement, and on each subsequent December 1st, the Company may increase the Weekly Fee to the Franchisee by an amount not to exceed 20% of the then current Weekly Fee.  In addition, in the event, as a result of local, state or federal law, rule or regulation, additional fees or expenses are charged to the Company in connection with the operation of its business, such additional fees or expenses shall be added to and become a part of the Weekly Fee.  Such additions to the Weekly Fee will not limit the Company from raising the Weekly Fee by up to 20% of the amount of the then current Weekly Fee on each December 1st subsequent to the execution of this Agreement.

5.   <u>Agreements of the Company</u>

The Company covenants and agrees with the Franchisee as follows:

5.1.   <u>Installation and Maintenance of the Radio</u>.  The Company shall install a Radio in good working order in the Franchisee's vehicle and deliver a portable hand-held Radio to the Franchisee.  The Radios will be compatible with the Company's dispatch network and will enable the Franchisee to receive communications from the Company's radio dispatch headquarters.  The Company will provide normal maintenance of the Radios; however, such maintenance will not include repairs and servicing required as a result of damage (including, without limitation, water damage) to the Radios, whether caused by accident, negligence, misuse, or breach of this Franchise Agreement.  All repairs and servicing required as a result of any such accident, negligence, misuse, or breach of this Franchise Agreement, including without limitation, removal and reinstallation of the installed Radio, will be at the Franchisee's sole cost and expense and will be performed at a service center designated in writing by the Company as a duly authorized service center.

5.2.   <u>Maintenance of Radio Dispatch Network</u>.  The Company will maintain a radio dispatch network providing continuous uninterrupted service for customers who call the Company's dispatch headquarters.  The Company will provide to the Franchisee radio dispatches indicating the location of fares to be picked up by the Franchisee and will use its best efforts to maintain a system that provides the Franchisee, together with all other Franchisees, an approximately equal opportunity to answer such radio dispatches, all as set forth in the Company's manual of rules and regulations, as the same may be amended from time to time (the "Manual"), a copy of which is annexed hereto as Exhibit 5.

5.3.   <u>Interruption of Services</u>.   In the event of a strike, interruption of the Company's telephone service, act of God, governmental act prohibiting, suspending or otherwise interfering with the Company's radio operations, or any other event or occurrence beyond the Company's control, the Company shall be excused from performing its obligations under this Agreement for the duration of such event and until its radio dispatch services may reasonably resume.

6.   <u>Agreements of the Franchisee</u>

The Franchisee covenants and agrees with the Company as follows:

6.1.   <u>Franchisee a Corporation</u>.   Franchisee must be a corporation formed and existing and in good standing at all times under the laws of the State of New York.

6.2.   <u>Use of the Franchise; Transfer of the Radio</u>.   No other entity, including without limitation, any person, partnership or corporation, will use the Franchisee's Franchise, including, without limitation, the Radios and any other services provided to the Franchisee hereunder, and the installed Radio shall not be removed or transferred to any other vehicle, whether or not such vehicle is owned by the Franchisee, without the prior written consent of the Company. Any driver of a Franchisee's vehicle who is not the owner of record of a controlling interest in Franchisee must be authorized in writing by the Company prior to using the Radios or the services of the Company. The Company's approval and authorization of a driver, other than the controlling stockholder of the Franchisee, shall be made at the Company's sole and unreviewable discretion and may be conditioned upon such terms and conditions, including without limitation, a requirement that such driver, at his own cost and expense, undergo the Company's screening process and attend the Company's compulsory training program, as the Company deems appropriate. The Company reserves the right to revoke its approval and authorization of any driver, other than the controlling stockholder of Franchisee, at any time, in its sole and unreviewable discretion. Upon termination of this Franchise Agreement, whether by default, assignment of the Franchise, or otherwise, the Radios, which the Franchisee acknowledges are and at all times will remain the property of the Company, will be returned to the Company and the installed Radio will be removed from the Franchisee's vehicle at the sole cost and expense of the Franchisee, and if the Franchise and the installed Radios are to be transferred to another vehicle, the Franchisee will bear the cost and expense of the removal and reinstallation of the installed Radio. In addition, the Franchisee will not pledge, mortgage, grant a security interest in, or otherwise encumber, the Radios.

6.3.   <u>Assignment of Franchise Agreement</u>.   (a) The Company will agree with a lender that provides financing for the Franchisee's vehicle that in the event of a default by the Franchisee of its obligations to such lender, the Company will consent to an assignment of the Franchise (and the underlying right to use the Radio) at such lender's request; provided, that such assignee is satisfactory to the Company.

(b)   Except as provided in Subsection (a) above, neither the Franchisee, nor its successor or assigns, shall assign this Franchise Agreement without the prior written consent of the Company. Upon any assignment by the Franchisee, the Franchisee will pay to the Company a Transfer Fee in the amount of $3,500.00; plus any amounts then due to the Company from the Franchisee, whether owed in respect of the Weekly Fee or the Service fee (as hereinafter defined), due under the Note, or otherwise, and will reimburse the Company for all expenses paid or incurred by the Company in connection with the transfer of the Franchise, including, without limitation, expenses in connection with the Company's review of prospective assignees, costs of investigation, credit evaluation and training. Any assignment to which the Company consents may be conditioned by the Company upon such additional terms and conditions as the Company may deem appropriate.

(c)   The issued and outstanding shares of the Franchisee's stock shall not be sold, assigned, pledged, mortgaged or transferred, nor shall there by an issuance of securities, such that the effective control of the Franchisee is changed without, in each instance, the prior written consent

of the Company. The Company's consent shall not be unreasonably withheld or delayed, but any such change in control shall be subject to the provisions of Section 6.3(b) of this Franchise Agreement which shall apply to any and all such transactions.

(d)     The Franchisee shall furnish to the Company, upon the execution of this Franchise Agreement, a certified list in the form annexed hereto as Attachment 3, of all of its stockholders of record and all persons having beneficial ownership of a Franchisee's shares of stock indicating their share holdings, as well as a list of the directors and officers of the Franchisee. The Franchisee shall promptly advise the Company in writing of any change in the stockholders, beneficial owners, directors and officers from time to time.

(e)     All officers, directors and shareholders of the Franchisee shall execute a personal guaranty of Franchisee's obligations to the Company under this Franchise Agreement and under the Note in connection with the purchase of the Franchise. The form of guarantee is annexed hereto as Attachment 4.

(f)     The articles of incorporation and by-laws of Franchisee and any successor shall recite that the issuance or transfer of any stock therein is restricted by the terms of an agreement and all issued and outstanding stock certificates of Franchisee shall bear the following legend:

"This certificate may not be transferred or pledged without the prior written consent of Golden Touch Transportation of NY, Inc."

(g)     In the event of the death or incapacity of a stockholder of Franchisee, his or her heirs or personal representatives can succeed as a stockholder upon notice to the Company, but neither the Company's approval nor a transfer fee shall be required.

6.4.     Insurance; Risk of Loss. From and after the date of installation of an installed Radio in the Franchisee's vehicle and the delivery of a portable hand-held radio to Franchisee, the Franchisee shall maintain insurance coverage on the Radios under an all-risk policy in the minimum face amount of $3,000 and liability coverage with respect to the operation of the Franchisee's vehicle in the amount of $5,000,000.00, or such lesser amount that the Company may approve in writing. The Franchisee assumes all risks for any and all loss or damage to the Radios, including, without limitation, loss or damage caused by fire, theft, collision or water, whether or not such loss or damage is caused by the Franchisee's negligence. In addition, Franchisee shall be responsible for maintaining workers' compensation insurance coverage and such other insurance as is or may be required by law.

6.5.     Rules and Regulations. The Franchisee will abide by all rules and regulations set forth in the Company's Manual, as the same may be amended from time to time.

6.6.     Fines; Penalties and Liabilities. The Franchisee will bear the sole cost and expense for any and all fines, penalties or liabilities which may be assessed by reason of any action, inaction or conduct of the Franchisee, or any employee, lessee, agent, contractor or any other person, corporation or entity using the Radios licensed hereunder. The Franchisee authorizes the Company

to deduct from the Franchisee's voucher checks the amount of any fine assessed by the Security Committee against the Franchisee or any employee, lessee, agent, contractor or any other person, corporation or entity using the Radios licensed hereunder.

6.7.    Customer Vouchers.  Upon receipt of a voucher from a charge account customer, the Franchisee, his employees, lessees or agents, will submit such voucher for payment to the Company or, if the Company so directs, to the Company's designated agent, within 72 hours of Franchisee's receipt thereof. Each voucher payment made to the Franchisee shall be subject to the following fees (the "Service Fee"):

(a)     Thirty Five (35%) percent of the face amount of the voucher (exclusive of amounts representing tolls) on all contractual work with airlines to transport airline crews; and

(b)     Forty (40%) percent of the face amount of the voucher (exclusive of amounts representing tolls) for all airline work to transport non crew customers of the airline and for all non airline customer accounts; and

(c)     All vouchers submitted by a specified day each week will be paid within thirty (30) business days from the specified submission date.

The Company reserves the right to increase the Service Fee, if one or more local, state or federal laws, rules or regulations, result in additional fees or expenses charged to the Company, or to its designated agent, as the case may be, in connection with the operation of its or their business. The Company also reserves the right to increase the Service Fee, on the December 1st immediately subsequent to the execution of this Franchise Agreement and on each December 1st thereafter; provided, that no such increase may exceed the preceding year's Service Fee by more than 10%.

6.8.    Internal Fare Schedules.  The Company shall have the right, with the consent of the Franchisees to establish an internal tariff or fare schedule pursuant to which all vouchers shall be priced for the purpose of determining the Section 6.7 Service Fee.  An internal tariff or fare schedule may be established hereunder in the same manner and in accordance with the provisions for amending this Franchise Agreement as set forth in Section 14 (b) hereof.  This internal tariff or fare schedule shall be independent of tariffs or fares pursuant to which invoices are prepared for customers of the Company.

6.9.    Changes in Fares.  The Company shall have the right and full discretion from time to time to establish, alter, amend, increase or decrease tariffs or fares quoted to customers of the Company and used internally in the absence of the establishment of an internal tariff or fare schedule under Section 6.8 hereof.  If an internal tariff or fare schedule is so established, then the Company's right and discretion hereunder shall extend only to tariffs or fares quoted to customers of the Company.

6.10.    Finders Fees and Brokers Commissions.  From time to time, the Company is required to pay finders fees or brokers commissions to persons unaffiliated with the Company in order to procure customers.  In the event  a finders fee or brokers commission is paid by the

Company, such fee shall be deducted from the face amount of each voucher to which such fee or commission is applicable and the Service Fee shall be calculated on the basis of such reduced amount and the Franchisee shall receive the balance. By way of example, if (i) an agreement with a customer calls for payment of $100 for service provided by a Franchisee; (ii) a toll of $3.50 is incurred in connection with performance of the service; (iii) service performed for such customer is subject to a finders fee of 10%; and (iii) the service performed authorizes the Company to take a 50% Service Fee; then the Franchisee will be entitled to payment of $48.50 for the voucher presented ($45.00 plus the toll) and the Company $45.00. This provision shall apply only when an internal tariff or fare schedule under Section 6.8 has not been established.

6.11.   _Cellular Telephones._ In the event the Franchisee provides the personnel of a customer with the use of a cellular telephone or other means of communication, the Franchisee shall note on the voucher the amount of telephone time used by the such personnel. The Company, or its designated agent, will pay the Franchisee for such telephone time, subject to a service fee of ten (10%) percent.

6.12.   _Maintenance of Vehicle and Quality of Service._ In addition to the rules and regulations set forth in the Manual, the Franchisee will at all times maintain a clean vehicle in good operating condition which shall be no more than three model years old, and offer customers referred by the Company courteous and efficient service. Any violation of this requirement, as evidenced by a customer complaint or a visual inspection of the vehicle, shall constitute a material breach of this Franchise Agreement and shall entitle the Company to terminate this Franchise Agreement upon ten days' prior written notice to the Franchisee.

6.13.   _Non-Competition._ From the date of this Franchise Agreement until the first anniversary of the termination or assignment of this Franchise Agreement, neither the Franchisee nor any of its officers, directors or stockholders will communicate with or offer transportation services to any party that is presently a customer of the Company or that becomes a customer of the Company prior to the termination or assignment of this Franchise Agreement. The Franchisee, its officers, directors and stockholders, each acknowledge that the remedy at law for a breach of this Agreement as set forth in this Section 6.13 would be wholly inadequate, and therefore, the Company shall be entitled to preliminary and permanent injunctive relief and specific performance of the agreement herein contained and shall not be required to post a bond. This Section 6.13 constitutes an independent and separable agreement of the Franchisee, its officers, directors and stockholders, and shall be enforceable notwithstanding any rights or remedies that the Company may have under any other provisions of this Franchise Agreement, or otherwise. If any or all of the provisions of this Section 6.13 are held to be unenforceable for any reason whatsoever, it shall not in any way invalidate or affect the remainder of this Franchise Agreement which shall remain in full force and effect.

7.   _Independent Contractor_

The Franchisee is and shall remain an independent contractor and shall not be deemed to be an employee, partner, co-venturer, or agent of the Company. The Franchisee shall at all times be free from the control or direction of the Company in the operation of the Franchisee's vehicle, and the

Company shall not supervise or direct the services to be performed by the Franchisee, except as specifically otherwise set forth herein. Franchisee shall be responsible for complying with applicable governmental regulations and for paying its drivers, lessees and agents. Without in any way limiting its obligations, Franchisee shall be responsible for maintaining workers' compensation insurance coverage and such other insurance as is or may be required by law.

8.   Training Program

Before commencement of the use of the Franchise, a representative of the Franchisee shall attend a compulsory training program of approximately 8 hours, which together with additional training, may take up to 16 hours. The training program will be taught to Franchisee's representative, at a cost of $250.00 per representative, by the Company's personnel, once per week at the Company's radio dispatch headquarters. The Company may also require each representative to attend a two-day training seminar at a cost of $100.00 per person. In addition, a representative of Franchisee will be required to attend at least two special annual meetings of the Franchisees (or more, if necessary) at which the Franchisee will be informed of any new rules or modifications to existing rules with respect to Franchisee conduct, innovations or proposals for changes in equipment, and general issues and problems affecting subscribers as a group. A representative of Franchisee will also be required to attend at least two discussion groups per year, at which small groups of Franchisees will meet with representatives of the Company's management to review and refresh their understanding of the Company's rules and regulations and to discuss certain targeted problems.

9.   Indemnification

The Franchisee shall indemnify and hold harmless the Company and each of its officers and directors (together the "Indemnified Parties" and individually each, an "Indemnified Party") from and against and in respect of any and all damage, loss, liability, cost and expense (including, without limitation, fees of counsel), resulting or arising from or incurred in connection with:

(a)   Any misrepresentation, breach of warranty or nonfulfillment or non-performance of any agreement, covenant, term or condition on the part of the Franchisee, its lessees, employees or agents under this Franchise Agreement, and the Franchisee agrees to pay to the Indemnified Party the amount which would then be required to put such Indemnified Party in the position that it or he would have been in had such representation or warranty been true, correct and complete, or had such agreement, term or condition been performed, complied with or fulfilled; and

(b)   Any and all actions, suits, proceedings demands, assessments, judgments, cost or expenses (including, without limitation, the fees of counsel) relating to any of the foregoing.

10.   Termination of the Franchise Agreement by the Franchisee

The Franchisee may terminate this Franchise Agreement in the event of a material breach of, or default under, this Franchise Agreement by the Company.

11.    <u>Termination of the Franchise Agreement by the Company</u>

The Company may terminate this Franchise Agreement as follows:

(a)    This Franchise Agreement may be canceled and annulled at any time in the sole discretion of the Company, within the one year period following the date that the Franchisee shall have commenced the use of its Franchise ("the Probationary Period"), by returning to the Franchisee the amount of the Franchise Fee paid to the Company by the Franchisee as of the date of termination less the sum of (x) the amount of the gross revenue earned by the Franchisee through the use of the Franchise, as evidenced by vouchers cashed by or submitted to the Company or its agent, and (y) $350.00, representing expenses incurred by the Company in connection with processing the Franchise.

(b)    The Company may terminate this Franchise Agreement at any time in the event the Franchisee shall make an assignment for the benefit of creditors or shall admit in writing its inability to pay its debts as they become due, or shall commence a voluntary case under any applicable bankruptcy, insolvency or similar law or shall file any petition or answer seeking for itself any reorganization, arrangement, composition or readjustment under any law or shall file any answer admitting or not contesting the material allegations of a petition filed against or it in any such proceeding, or shall seek a consent to or acquiesce in the appointment of any trustee or receiver of itself or of all or any substantial portion of its properties, or if a court having jurisdiction in the premises shall enter a decree or order for relief in respect of it in an involuntary case under any applicable bankruptcy or insolvency law, or if within sixty days after the commencement of any action against it seeking any reorganization, arrangement, composition or readjustment under any law, such action shall not have been dismissed or all orders or proceedings thereunder affecting its operations shall not have been stayed or if within 30 days after the appointment of any trustee or receiver of him or it or of all or any substantial portion of his or its properties, such appointment shall not have been vacated.

(c)    The Company may terminate this Franchise Agreement at any time if the Franchisee defaults in the payment of any amounts due to the Company under this Agreement or in connection with the purchase of the Franchise, if such default is not cured within 30 days following written notice from the Company to the Franchisee demanding payment of such defaulted amount, or if the Franchisee defaults in or breaches any of his obligations under this Franchise Agreement (other than the payment of money) including, without limitation:

i.    if the installed Radio is removed from the Franchisee's vehicle without the prior written authorization of the Company; or

ii.    if the installed Radio is transferred to any other vehicle without the prior written authorization of the Company; or

iii.    if either the installed Radio or the portable hand-held radio is repaired by any party other than an authorized service center designated in writing by the Company; or

        iv.    if the marker identifying the Company as the owner of the Radios is removed without the prior written authorization of the Company; or

        v.    if the Radios or the Franchise is pledged, encumbered, used as collateral, subjected to a lien or used as a security interest without the prior written authorization of the Company; or

        vi.    if the Franchisee fails to pay for the removal or transfer of the installed Radio upon an assignment of the Franchise; or

        vii.    if the Franchisee fails to maintain all insurance coverage required under this Franchise Agreement; or

        viii.    if the Franchisee permits any other entity, including without limitation any person, partnership or corporation, to use the Radios or the services of the Company without the prior written authorization of the Company; or

        ix.    if in the use of the Franchise there is substantial or repeated violations of any of the Company's rules or regulations as set forth in the Manual; or

        x.    if the Franchisee fails to maintain a clean vehicle in good operating condition which shall be no more than three model years old, and or fails to offer courteous and efficient services, as required by the Manual and this Franchise Agreement; or

        xi.    if the Franchisee communicates with or offers or provides transportation services to any of the Company's customers other than in conjunction with the Company's business; or

        xii.    if at any time the Franchisee fails to indemnify and hold the Company harmless as required under this Franchise Agreement; or

        xiii.    if the Franchisee repeatedly fails to provide an authorized vehicle on an every day basis for use in connection with Company's Business without first notifying the Company; or

        xiv.    if the Franchisee fails to comply with any law, rule, regulation, ordinance, order, or directive of any governmental, quasi-governmental department, agency, commission, board or body asserting authority over the Company and/or the Franchisee.

Termination of this Franchise shall not be the Company's exclusive remedy, and the Company shall have other and different remedies including, but not limited to, the suspension of some or all of Franchisee's rights hereunder and the imposition of assessments and fines.

12.   <u>Damages and Other Obligations</u>.   (a)   Upon termination of this Franchise Agreement by the Franchisee following a material breach of, or default under, this Franchise Agreement by the Company, the Franchisee shall be entitled to receive from the Company an amount

determined by multiplying (x) the difference between the number of years constituting the full term of this Franchise Agreement not to exceed twenty, and the number of full years of the Term that elapsed prior to termination of this Franchise Agreement by the Franchisee, by (y) a fraction, the numerator of which is the Franchise Fee and the denominator of which is the full term of this Franchise Agreement, not to exceed twenty years. The amount, if any, so determined shall constitute the sole damages to which the Franchisee shall be entitled as a result of a material breach of, or default under, this Franchise Agreement by the Company. The Company shall be entitled to offset any amount owed to the Franchisee under this Section by any principal and interest then remaining owing under the Note.

(b)     Upon termination of this Franchise Agreement following a breach or default by the Franchisee, the Company shall be entitled to retain the Franchise Fee and in addition shall be entitled to damages, which shall include, without limitation, the following:

(i)     Weekly Fees for each week that the Radios remain in the possession of the Franchisee;

(ii)     Any costs incurred or paid in connection with the removal, repair, and reinstallation and or replacement of the installed Radio or the portable hand-held Radio; and

(iii)     Reasonable expenses, including, without limitation, attorneys' fees, disbursements and court costs incurred or paid in connection with the termination of the Franchise Agreement and the recovery, removal, reinstallation, and or replacement of the Radios.

(c)     Upon termination of this Franchise Agreement following a breach or default by the Franchisee, the Franchisee shall continue to be obligated: under Section 6.2 hereof to return the Radio to the Company; under Section 6.13 not to offer transportation services to the Company's customers; under Section 9 to indemnify and hold the Company harmless; under Sections 3 and 6.6 to continue payments, if any, due to the Company. In addition to the foregoing continuing obligations, the Franchisee will continue to be obligated to pay all monies due to the Company irrespective of the reason therefor and shall be required to remove all logos and service marks bearing the words "Golden Touch" or other proprietary logo or mark of the Company.

13.     Notices.     All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given when personally delivered or mailed by registered or certified mail, to the addresses herein designated, or at such other address as may be designated by notice to the other party. If to the Franchisee, at the address given in the prefatory Section of this Agreement; and if to the Company, Golden Touch Transportation of NY, Inc., 109-15 14th Avenue, Flushing, New York 11356, Attn: Thomas Herrschaft, with copies to: Fox Horan & Camerini LLP, 825 Third Avenue, 11th Floor, New York, New York 10022, Attn: Wayne I. Baden, Esq.

14.     Amendments and Entire Agreement.

(a)     This Franchise Agreement contains the entire agreement between the parties

hereto with respect to the transactions contemplated hereby and supersedes all prior understandings, representations, warranties, promises and undertakings made orally or in writing between the parties.

(b)     All Franchise Agreements may be amended upon the consent of the Company and the consent of a majority of Franchisees who have submitted vouchers to the Company or its agents within the twelve month period prior to the delivery of notice of the Company's or the Franchisees' intention to amend all Franchise Agreements. Such consents may be in writing or may be given at a meeting of Franchisees called on proper notice given at least ten (10) days prior to such meeting. Such meetings shall be held in the City of New York. Each amendment properly consented to shall be binding on all Franchisees even if they did not consent thereto.

(c)     This Franchise Agreement may also be changed or modified by a written instrument executed by the parties hereto.

15.     Parties in Interest. This Franchise Agreement shall inure to the benefit of and be binding upon the parties named herein and their respective successors and assigns; provided, any assignment by the Franchisor is made pursuant to the terms and conditions set forth in this Franchise Agreement. In the event of the death or incapacity of a shareholder of the Franchise, an individual, this Franchise Agreement shall inure to the benefit of the shareholder's heirs or personal representatives pursuant to the terms and conditions set forth in this Franchise Agreement.

16.     Law to Govern. This Franchise Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to conflict of laws and rules.

17.     No Waiver, Cumulative Remedies. No failure or delay on the part of any party hereto in exercising any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power or remedy preclude any other further exercise thereof or the exercise of any other right, power or remedy hereunder. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law.

18.     Severability. If any part of this Franchise Agreement is found to be contrary to public policy or declared invalid for any reason such a finding or declaration shall not invalidate any other part of this Franchise Agreement.

19.     Section and Other Heading. The section and other headings contained in this Franchise Agreement are for reference purposes only and shall not affect the interpretation or meaning of this Franchise Agreement.

20.     Arbitration In Certain Circumstances. The sole and exclusive method of resolving any claim or controversy whatsoever between the parties herein or between the Company and the driver of Franchisee, unless otherwise specified in this agreement or in any other written agreement between the parties, shall be binding arbitration according to the procedures set forth in this section. Disputes which shall be subject to binding arbitration shall include but shall not be limited to: (i) the amount of payment for or deduction from Franchisee's or Franchisee's driver's voucher payments;

(ii) any monetary fine assessed against a Franchisee or Franchisee's driver pursuant to Rules and Regulations promulgated under the Franchise Agreement or related Contract for Service Agreement or (iii) any claim for discrimination of work offered to Franchisee or Franchisee's driver. The procedure to be followed by the Franchisee or Franchisee's driver with respect to any controversy set forth in subsection (i), (ii) or (iii) of this paragraph shall be the following: in each instance, Franchisee or Franchisee's driver shall first submit such claim or controversy to Director of Franchise Relations of the Company and if the aggrieved Franchisee or Franchisee's driver is not satisfied by the decision of the Director of Franchise Relations of the Company, then Franchisee or Franchisee's driver shall submit the same to binding arbitration conducted by a single arbitrator and administered by the American Arbitration Association under its Commercial Arbitration Rules, or by such other independent and impartial organization as may be designated by the Company, and the determination rendered by the arbitrator shall be final and may be entered in any court having jurisdiction over the parties. In any claim or controversy not within the scope of subsection (i), (ii) or (iii) of this paragraph, submission to the Director of Franchise Relations of the Company shall not be required. In any arbitration hereunder each party shall bear its own expenses, including legal fees; provided, however, that in the event Franchisee or Franchisee's driver recovers more than two-thirds of the amount in controversy, the Company shall reimburse Franchisee's or Franchisee's driver's filing fees but no other expenses or fees. An arbitrator shall have the authority to award compensatory damages only. This section shall not apply to any claim or cause brought by the Company to enforce a non-competition agreement between the parties herein or between the Company and a driver of Franchisee, or to any termination of this Agreement, or to any suspensions of an individual's right to operate the Franchise as a driver. Each claim or controversy required to be arbitrated pursuant to this provision must be submitted in writing first to the Director of Franchise Relations of the Company within 60 days after the date the claim or controversy arose (if such submission is required), and must be submitted to arbitration in accordance with the applicable arbitration rules within one hundred and eighty (180) days after the date the Director of Franchise Relations of the Company renders his final determination on such claim or controversy or within 180 days from the date the claim or controversy arose if submission to the Director of Franchise Relations of the Company is not required by this section. These limitations on the time for submitting claims and controversies shall be applicable to such claims and controversies notwithstanding any longer period that may be provided by statute or the Commercial Arbitration Rules, and failure to submit such claims and controversies in a timely manner shall be a complete bar to such claims or controversies. The Arbitrator shall decide any controversy hereunder in accordance with: the terms of this Agreement, the rules promulgated by the Company, and the substantive law of the State of New York.

21.    Waiver of Trial By Jury. To the extent permitted by law, the respective parties hereto hereby waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Franchise Agreement or breach thereof for any claim of damage resulting from any act or omission of the parties in any way connected with this Franchise Agreement.

22.    Assignment by the Company. The Company shall have the right, in its sole discretion, to assign the Franchise Agreement or all or any of its obligations and rights thereunder provided that the assignee of the Company's obligations under such assignment is, in the Company's

reasonable judgment, able to perform the Company's obligations under this Agreement. Upon such assignment, the Company shall have no further liability to Franchisee for the obligations assigned.

IN WITNESS WHEREOF, the parties hereto have caused this Franchise Agreement to be duly executed as of the day and year first written above.

GOLDEN TOUCH TRANSPORTATION OF NY, INC.

BY: _____

DOUBLE "K" USA, CORP., FRANCHISEE

BY: _____
Konstantin Dergunov, President

# EXHIBIT C

Franchise No.: <u>V8</u>

## FRANCHISE AGREEMENT

FRANCHISE AGREEMENT, made this thirteenth day of June, 2008, by and between Golden Touch Transportation of NY, Inc., a New York corporation (the "Company"), with offices at 109-15 14th Avenue, Flushing, New York 11356 and **LOKEKO INC.**, a New York corporation (hereinafter referred to as the "Franchisee"), having its principal place of business at, 20 Merle Place, Apt. 4M, Staten Island, NY 10305.

The Company operates a two-way radio dispatch transportation service in the City of New York and the surrounding metropolitan area. The Franchisee wishes to avail itself of the services supplied by the Company's two-way radio dispatch network and to use the trade name and certain other products and services of the Company.

NOW, THEREFORE, in consideration of the mutual promises herein contained, and for other good and valuable consideration set forth herein, the parties agree as follows:

1.    <u>The Franchise Agreement</u>

Contemporaneously with the execution and delivery of this Franchise Agreement, and subject to the terms and conditions herein contained, the Company is selling to the Franchisee, and the Franchisee is purchasing from the Company, the right to participate in the Company's two-way radio dispatch network and to use certain other products and services in connection therewith, and the right to use the Company's trade name and two-way radio that is and will remain the property of the Company, which shall be installed by the Company in the Franchisee's vehicle, as described in 5.1 hereof (the "Radio"). All of the foregoing rights are hereinafter referred to as the "Franchise." The term of this Franchise Agreement shall commence on the date following the execution hereof and shall continue for a period of ten years thereafter (the "Term"); however, following the expiration of the Term, this Franchise Agreement may be extended from year to year upon the prior written consent of the Franchisee and the Company. The Company authorizes the Franchisee to use the Company's trade/service mark only for so long as the Franchise Agreement remains in full force and effect. The Franchisee has no property right in or contractual right to the continued use of the name and mark in the event that the Company elects to alter the name and/or the mark, provided, however, that any alteration of the name and/or mark shall apply to all Franchisees.

2.    <u>Type of Franchise</u>

The Company hereby agrees to sell and the Franchisee hereby agrees to buy for the price indicated the Franchise offered by the Company as set forth below:

(initial one of the following)

| | | |
|---|---|---|
| Passenger Coach Bus  Franchise: | $25,000.00 | (  ) |
| Van Franchise: | $25,000.00 | (  ) |
| Shared-Ride Van Franchise: | $25,000.00 | (  ) |
| Sedan or SUV Franchise: | $15,000.00 | (  ) |

OR    Check here if franchisee is purchasing from an
existing franchise holder pursuant to the terms
in the Contract of Sale of even date                    ( X )

Purchasing from:              DIMALEX INC. V8
                          Seller's Name and Franchise Number

Transfer Fee:                        $ 3,500.00

3.    Consideration

          In full consideration of the aforesaid sale, including, without limitation, the
installation, license and use of a Mobile Data Terminal ("MDT") and license and use of a Company
owned two-way communications device ("Radio"), the Franchisee is delivering to the Company
contemporaneously herewith:

          (i) a Franchise fee of $_ N/A _ (the "Franchise Fee"), for which a down payment has
been received in the amount of $_ N/A _ and the balance is payable by (a) certified or bank cashier's
check to the order of the Company in the amount of $_ N/A _ , or (b) a promissory note (the "Note")
to the order of the Company in the principal amount of $_ N/A _ with a term not to exceed four
years and bearing interest at the rate of $_ N/A _ percent per year, and related agreements in the
forms annexed hereto as Attachments 1 and 2;

          (ii)      a weekly management fee (the "Weekly Management Fee") of $64.20, a
weekly Radio fee of $16.25 (the "Weekly Radio Fee"), and a weekly MDT fee of $13.25 (the
"Weekly MDT Fee") all of which are collectively referred to as the "Weekly Fees," which Weekly
Fees will be applied to the Weekly Fee in respect of the first week following the installation by the
Company of the MDT in the Franchisee's vehicle; and

4.    The Weekly Fees

          The Weekly Fees are payable by the Franchisee weekly, in advance, commencing on
the first Friday following the installation of the MDT in the Franchisee's vehicle, whether or not the
Franchisee, or any other authorized person or entity, actually uses the Franchise, for each week
following the installation of the MDT in the Franchisee's vehicle so long as the Company is
operating its dispatch network.  Notwithstanding the foregoing, in the event of a strike, interruption
of the Company's telephone service, act of God, governmental act prohibiting, suspending or
otherwise interfering with the Company's dispatch operations or any other event or occurrence
beyond the Company's control, which event or occurrence continues for a period in excess of 48

hours, the Franchisee shall be entitled to a pro rata reduction of the Weekly Fees for the duration of such event beyond such 48 hour period.

4.1.    Weekly Fees Increases.  On the December 1st immediately subsequent to the execution of this Franchise Agreement, and on each subsequent December 1st, the Company may increase each or all of the Weekly Fees to the Franchisee by an amount not to exceed 20% of the then current Weekly Fees.  In addition, in the event, as a result of local, state or federal law, rule or regulation, additional fees or expenses are charged to the Company in connection with the operation of its business, such additional fees or expenses shall be added to and become a part of the Weekly Fee.  Such additions to the Weekly Fees will not limit the Company from raising the Weekly Fees by up to 20% of the amount of the then current Weekly Fees on each December 1st subsequent to the execution of this Agreement.

5.    Agreements of the Company

The Company covenants and agrees with the Franchisee as follows:

5.1.    Installation and Maintenance of the MDT and Radio.  The Company shall install a MDT in good working order in the Franchisee's vehicle and Company owned two-way communications device ("Radio").  The Radio will be compatible with the Company's dispatch network and will enable the Franchisee to receive voice communications from the Company's dispatch headquarters.  The Company will provide normal maintenance of the MDT and Radio; however, such maintenance will not include repairs and servicing required as a result of damage (including, without limitation, water damage), whether caused by accident, negligence, misuse, or breach of this Franchise Agreement.  All repairs and servicing required as a result of any such accident, negligence, misuse, or breach of this Franchise Agreement, including without limitation, removal and reinstallation of the installed MDT will be at the Franchisee's sole cost and expense and will be performed at a service center designated in writing by the Company as a duly authorized service center.

5.2.    Maintenance of Radio Dispatch Network.  The Company will maintain a dispatch network providing continuous uninterrupted service for customers who call the Company's dispatch headquarters.  The Company will provide to the Franchisee dispatches indicating the location of fares to be picked up by the Franchisee and will use its best efforts to maintain a system that provides the Franchisee, together with all other Franchisees of like type, an approximately equal opportunity to answer such dispatches of the type Franchisee is equipped to service, all as set forth in the Company's manual of rules and regulations, as the same may be amended from time to time (the "Manual"), a copy of which has been provided to Franchisee.

5.3.    Interruption of Services.  In the event of a strike, interruption of the Company's telephone service, act of God, governmental act prohibiting, suspending or otherwise interfering with the Company's dispatch operations, or any other event or occurrence beyond the Company's control, the Company shall be excused from performing its obligations under this Agreement for the duration of such event and until its radio dispatch services may reasonably resume.

5.4     Maintenance of Franchise Sales Lists.  Each Franchisee may sell, lease, or operate its Franchise. In addition, separate franchise sales lists will be maintained by the Company; one for each category of Franchise.  The Company will not sell for its own account any new Company Franchise in any category if a Franchisee in that category that is current on its obligations under the Franchise Agreement places its Franchise on the Company's list for sale and the total number of the Company's Franchisees that are in operation has not fallen below 124 Franchises. The Company will use reasonable efforts to maintain the price for Franchise re-sales made on behalf of Franchisees at the price set forth in the then current Franchise Offering Circular.  If such re-sale is financed, it will be financed on the same terms and conditions as the Company adopts for its own sales. A Franchisee may also sell its Franchise other than in connection with a sale through the lists maintained by the Company; however, such independent re-sales are subject to the Company's right of first refusal.

6.      Agreements of the Franchisee

The Franchisee covenants and agrees with the Company as follows:

6.1.    Franchisee a Corporation.  Franchisee must be a corporation formed and existing and in good standing at all times under the laws of the State of New York.

6.2.    Use of the Franchise; Transfer of the MDT. No other entity, including without limitation, any person, partnership or corporation, will use the Franchisee's Franchise, including, without limitation, the Radio, MDT (for communication with the Company) and any other services provided to the Franchisee hereunder, and the installed MDT shall not be removed or transferred to any other vehicle, whether or not such vehicle is owned by the Franchisee, without the prior written consent of the Company.  Any driver of a Franchisee's vehicle who is not the owner of record of a controlling interest in Franchisee must be authorized in writing by the Company prior to using the MDT or Radio, or the services of the Company.  The Company's approval and authorization of a driver, other than the controlling stockholder of the Franchisee, shall be made at the Company's sole and unreviewable discretion and may be conditioned upon such terms and conditions, including without limitation, a requirement that such driver, at its own cost and expense, undergo the Company's screening process and attend the Company's compulsory training program, as the Company deems appropriate.  Additionally, all drivers must meet and have the approval of all governmental agencies and licensing authorities having jurisdiction over the driver's right to drive a vehicle used by a Franchisee.  The Company reserves the right to revoke its approval and authorization of any driver, other than the controlling stockholder of Franchisee, at any time, in its sole and unreviewable discretion.  Upon termination of this Franchise Agreement, whether by default, assignment of the Franchise, or otherwise, the MDT and Radio, which the Franchisee acknowledges are and at all times will remain the property of the Company, will be returned to the Company and the MDT will be removed from the Franchisee's vehicle at the sole cost and expense of the Franchisee, and if the Franchise and the MDT and Radio are to be transferred to another vehicle, the Franchisee will bear the cost and expense of the removal and reinstallation of the installed MDT. In addition, the Franchisee will not pledge, mortgage, grant a security interest in, or otherwise encumber, the MDT and Radio.

6.3.   <u>Assignment of Franchise Agreement</u>.  (a) The Company will agree with a lender that provides financing for the Franchisee's vehicle that in the event of a default by the Franchisee of its obligations to such lender, the Company will consent to an assignment of the Franchise (and the underlying right to use the MDT and Radio) at such lender's request; provided, that the Company does not exercise its right of first refusal and such assignee is satisfactory to the Company.

(b)   Except as provided in paragraphs (a) above and (c) below, the Franchisee, or its successors and assigns shall not assign this Franchise Agreement without the prior written consent of the Company.

In the event a Franchisee intends to assign its Franchise, the Franchisee, or its representative, shall give the Company notice of its intention to assign its Franchise. The notice shall set forth the name and address of the proposed purchaser and all the terms and conditions of any proposed assignment. The Company shall have the first option to purchase the Franchisee's Franchise by giving notice to the Franchisee of its intention to repurchase the Franchise within 15 days following the Company's receipt of the Franchisee's notice (the "Option Period"). The price for the repurchase of the Franchise by the Company shall be the same as that which the purchaser agreed to pay, and upon the same terms and conditions. The repurchase price can be paid by the Company by a certified or bank cashier's check to the order of the Franchisee.

If the Company fails to exercise its option, the Franchisee may assign its Franchise for a period of 45 days following the expiration of the Option Period (the "Assignment Period") on the same terms and conditions as the offer.  Upon any such assignment by the Franchisee, the Franchisee will pay to the Company $3,500.00 plus any amounts then due to the Company from the Franchisee, whether owed in respect of the Weekly Fees, due under the Note, or otherwise, and will reimburse the Company for any expenses paid or incurred by the Company in connection with the transfer of the Franchise, including, without limitation, expenses in connection with the Company's review of prospective assignees, costs of investigation, credit evaluation and training.  Any assignment to which the Company consents may be conditioned by the Company upon such additional terms and conditions as the Company may deem appropriate, plus, in each case, receipt by the Company of all amounts due to the Company from the Franchisee for its Franchise Fee, Weekly Fees, and/or Service Fee (as such term is hereinafter defined) as well as any charges incurred by the Company in connection with the assignment.  However, if the Franchisee fails to assign its Franchise during the Assignment Period for any reason, the Company shall have the first option to purchase the Franchise upon any subsequent sale or assignment of the Franchise.

(c)   In the event of the death or permanent incapacity of the shareholder of a corporate Franchisee, the heirs or personal representatives of the shareholder of the Franchisee may, upon notice to the Company, succeed to the shareholder's interest in the Franchise without the approval of the Company and not subject to its right of first refusal or payment of a transfer fee.

(d)   The issued and outstanding shares of the Franchisee's stock shall not be sold, assigned, pledged, mortgaged or transferred, nor shall there by an issuance of securities, such that the effective control of the Franchisee is changed without, in each instance, the prior written consent of the Company.  The Company's consent shall not be unreasonably withheld or delayed, but any

such change in control shall be subject to the provisions of Section 6.3(b) of this Franchise Agreement which shall apply to any and all such transactions.

(e)   The Franchisee shall furnish to the Company, upon the execution of this Franchise Agreement, a certified list in the form annexed hereto as Attachment 3, of all of its stockholders of record and all persons having beneficial ownership of a Franchisee's shares of stock indicating their share holdings, as well as a list of the directors and officers of the Franchisee. The Franchisee shall promptly advise the Company in writing of any change in the stockholders, beneficial owners, directors and officers from time to time.

(f)   All officers, directors and shareholders of the Franchisee shall execute a personal guaranty of Franchisee's obligations to the Company under this Franchise Agreement and under the Note in connection with the purchase of the Franchise. The form of guarantee is annexed hereto as Attachment 4.

(g)   The articles of incorporation and by-laws of Franchisee and any successor shall recite that the issuance or transfer of any stock therein is restricted by the terms of an agreement and all issued and outstanding stock certificates of Franchisee shall bear the following legend:

"This certificate may not be transferred or pledged without the prior written consent of Golden Touch Transportation of NY, Inc."

6.4.   <u>Insurance; Risk of Loss</u>. From and after the date of installation of a MDT in the Franchisee's vehicle, the Franchisee shall maintain insurance coverage on the MDT under an all-risk policy in the minimum face amount of $3,000 and liability coverage with respect to the operation of the Franchisee's vehicle in the amount of $5,000,000, or such lesser amount that the Company may approve in writing. The Franchisee assumes all risks for any and all loss or damage to the Radio and the MDT, including, without limitation, loss or damage caused by fire, theft, collision or water, whether or not such loss or damage is caused by the Franchisee's negligence. In addition, Franchisee shall be responsible for maintaining workers' compensation insurance coverage and such other insurance as is or may be required by law. The Franchisee shall hold the Company harmless from any claims and damages that may arise as a result of not having the proper insurance in place.

6.5.   <u>Rules and Regulations</u>. The Franchisee will abide by all rules and regulations set forth in the Company's Manual, as the same may be amended from time to time.

6.6.   <u>Fines; Penalties and Liabilities</u>. The Franchisee will bear the sole cost and expense for any and all fines, penalties or liabilities which may be assessed by reason of any action, inaction or conduct of the Franchisee, or any employee, lessee, agent, contractor or any other person, corporation or entity using the Franchise licensed hereunder. The Franchisee authorizes the Company to deduct from the Franchisee's voucher checks the amount of any fine assessed by any governmental agency, department, or commission or by the Security Committee against the Franchisee or any employee, lessee, agent, contractor or any other person, corporation or entity using the Radio licensed hereunder.

6.7.   <u>Customer Vouchers</u>.  Upon receipt of a voucher from a charge account customer or individual using a voucher or cash to purchase per-seat or per trip transportation, the Franchisee, its employees, lessees or agents, will submit such voucher for payment to the Company or, if the Company so directs, to the Company's designated agent, within 48 hours of Franchisee's receipt thereof and shall submit such cash promptly at such depository or depositories as Company shall designate. Each voucher payment made to the Franchisee shall be subject to the following fees (the "Service Fee"):

(a)   Thirty Five percent (35%) of the Base Fare of the voucher ("Base Fare" being the amount of the voucher less credit card processing fees and amounts representing tolls, parking, and other cash layouts and driver's gratuities) on all contractual work with airlines to transport airline crews; and

(b)   Forty percent (40%) of the Base Fare of the voucher and cash payment for all airline work to transport non crew customers of the airline; and

(c)   Thirty percent (30%) of the Base Fare of the voucher or credit card proceeds and cash received from individual customers transportation on a per-seat basis ("shared ride"); and

(d)   For Shared-Ride Franchisees, the amount of $220.00 shall be deducted every two weeks from voucher and cash payments to pay Port Authority fees.

(e)   All vouchers and cash submitted by a specified day each week will be paid within thirty (30) business days from the specified submission date.

(f)   Any payment discrepancies alleged by a Franchisee must be brought to the attention of the Company in writing within fourteen (14) business days after receipt of payment.

The Company reserves the right to increase the Service Fee, if one or more local, state or federal laws, rules or regulations, result in additional fees or expenses charged to the Company, or to its designated agent, as the case may be, in connection with the operation of its or their business. The Company also reserves the right to increase the Service Fee, on the December 1st immediately subsequent to the execution of this Franchise Agreement and on each December 1st thereafter; provided, that no such increase may exceed the preceding year's Service Fee by more than 10%.

6.8.   <u>Internal Fare Schedules</u>.  The Company shall have the right, with the consent of the Franchisees to establish an internal tariff or fare schedule pursuant to which all vouchers shall be priced for the purpose of determining the Section 6.7 Service Fee.  An internal tariff or fare schedule may be established hereunder in the same manner and in accordance with the provisions for amending this Franchise Agreement as set forth in Section 14 (b) hereof.  This internal tariff or fare schedule shall be independent of tariffs or fares pursuant to which invoices are prepared for customers of the Company.

6.9.   <u>Changes in Fares</u>.  The Company shall have the right and full discretion from

time to time to establish, alter, amend, increase or decrease tariffs or fares quoted to customers of the Company and used internally in the absence of the establishment of an internal tariff or fare schedule under Section 6.8 hereof. If, and only if, an internal tariff or fare schedule is so established, then the Company's right and discretion hereunder shall extend only to tariffs or fares quoted to customers of the Company.

6.10.   <u>Finders Fees and Brokers Commissions</u>. From time to time, the Company is required to pay finders fees or brokers commissions to persons unaffiliated with the Company in order to procure customers.  In the event  a finders fee or brokers commission is paid by the Company, such fee shall be deducted from the face amount of each voucher to which such fee or commission is applicable and the Service Fee shall be calculated on the basis of such reduced amount and the Franchisee shall receive the balance. By way of example, if (i) an agreement with a customer calls for payment of $100.00 for service provided by a Franchisee; (ii) a toll of $8.00 is incurred in connection with performance of the service; (iii)  service performed for such customer is subject to a finders fee of 10%; and (iii) the service performed authorizes the Company to take a 40% Service Fee; then the Franchisee will be entitled to payment of $62.00 for the voucher presented ($54.00 plus the toll) and the Company $36.00.  This provision shall apply only when an internal tariff or fare schedule under Section 6.8 has not been established.

6.11.   <u>Cellular Telephones</u>.  In the event the Franchisee provides the personnel of a customer with the use of a cellular telephone or other means of communication, the Franchisee shall note on the voucher the amount of telephone time used by such personnel. The Company, or its designated agent, will pay the Franchisee for such telephone time, subject to a service fee of ten (10%) percent.

6.12.   <u>Maintenance of Vehicle and Quality of Service</u>.  In addition to the rules and regulations set forth in the Manual, the Franchisee will at all times maintain a clean vehicle in good operating condition which shall be no more than five model years old, and offer customers referred by the Company courteous and efficient service.  Any violation of this requirement, as evidenced by a customer complaint or a visual inspection of the vehicle, shall constitute a material breach of this Franchise Agreement and shall entitle the Company to terminate this Franchise Agreement upon ten days' prior written notice to the Franchisee.

6.13.   <u>Non-Competition</u>.  From the date of this Franchise Agreement until the first anniversary of the termination or assignment of this Franchise Agreement, neither the Franchisee nor any of its officers, directors, stockholders, or drivers will communicate with or offer transportation services to any party that is presently a customer of the Company or that becomes a customer of the Company prior to the termination or assignment of this Franchise Agreement. The Franchisee, its officers, directors and stockholders, each acknowledge that the remedy at law for a breach of this Agreement as set forth in this Section 6.13 would be wholly inadequate, and therefore, the Company shall be entitled to preliminary and permanent injunctive relief and specific performance of the agreement herein contained and shall not be required to post a bond.  This Section 6.13 constitutes an independent and separable agreement of the Franchisee, its officers, directors and stockholders, and shall be enforceable notwithstanding any rights or remedies that the Company may have under any other provisions of this Franchise Agreement, or otherwise. If any or all of the provisions of this Section 6.13 are held to be unenforceable for any reason whatsoever, it shall not in any way

invalidate or affect the remainder of this Franchise Agreement which shall remain in full force and effect.

6.14. _Availability_. The Franchisee shall make its authorized vehicle available for dispatches from the Company each and every day during the term of this Agreement for a minimum of twelve (12) consecutive hours each day.

## 7. Independent Contractor

The Franchisee is and shall remain an independent contractor and shall not be deemed to be an employee, partner, co-venturer, or agent of the Company. The Franchisee shall at all times be free from the control or direction of the Company in the operation of the Franchisee's vehicle, and the Company shall not supervise or direct the services to be performed by the Franchisee, except as specifically otherwise set forth herein. Franchisee shall be responsible for complying with applicable governmental regulations and for paying its drivers, lessees and agents. Without in any way limiting its obligations, Franchisee shall be responsible for maintaining workers' compensation insurance coverage and such other insurance as is or may be required by law.

## 8. Training Program

Before commencement of the use of the Franchise, a representative of the Franchisee shall attend a compulsory training program of approximately 8 hours, which together with additional training, may take up to 16 hours. The training program will be taught to Franchisee's representative, at a cost of $250.00 per representative, by the Company's personnel, once per week at the Company's radio dispatch headquarters. The Company may also require each representative to attend a two-day training seminar at a cost of $100.00 per person. In addition, a representative of Franchisee will be required to attend at least two special annual meetings of the Franchisees (or more, if necessary) at which the Franchisee will be informed of any new rules or modifications to existing rules with respect to Franchisee conduct, innovations or proposals for changes in equipment, and general issues and problems affecting subscribers as a group. A representative of Franchisee will also be required to attend at least two discussion groups per year, at which small groups of Franchisees will meet with representatives of the Company's management to review and refresh their understanding of the Company's rules and regulations and to discuss certain targeted problems.

## 9. Indemnification

The Franchisee shall indemnify and hold harmless the Company and each of its officers and directors (together the "Indemnified Parties" and individually each, an "Indemnified Party") from and against and in respect of any and all damage, loss, liability, cost and expense (including, without limitation, fees of counsel), resulting or arising from or incurred in connection with:

(a)    Any misrepresentation, breach of warranty or nonfulfillment or

non-performance of any agreement, covenant, term or condition on the part of the Franchisee, its lessees, employees or agents under this Franchise Agreement, and the Franchisee agrees to pay to the Indemnified Party the amount which would then be required to put such Indemnified Party in the position that it or he would have been in had such representation or warranty been true, correct and complete, or had such agreement, term or condition been performed, complied with or fulfilled; and

(b)     Any and all actions, suits, proceedings demands, assessments, judgments, cost or expenses (including, without limitation, the fees of counsel) relating to any of the foregoing.

10.    <u>Termination of the Franchise Agreement by the Franchisee</u>

The Franchisee may terminate this Franchise Agreement in the event of a material breach of, or default under, this Franchise Agreement by the Company.

11.    <u>Termination of the Franchise Agreement by the Company</u>

The Company may terminate this Franchise Agreement as follows:

(a)     This Franchise Agreement may be canceled and annulled at any time in the sole discretion of the Company, within the one year period following the date that the Franchisee shall have commenced the use of its Franchise ("the Probationary Period"), by returning to the Franchisee the amount of the Franchise Fee paid to the Company by the Franchisee as of the date of termination less the sum of (x) the amount of the gross revenue earned by the Franchisee through the use of the Franchise, as evidenced by vouchers cashed by or submitted to the Company or its agent, and (y) $350.00, representing expenses incurred by the Company in connection with processing the Franchise.

(b)     The Company may terminate this Franchise Agreement at any time in the event the Franchisee shall make an assignment for the benefit of creditors or shall admit in writing its inability to pay its debts as they become due, or shall commence a voluntary case under any applicable bankruptcy, insolvency or similar law or shall file any petition or answer seeking for itself any reorganization, arrangement, composition or readjustment under any law or shall file any answer admitting or not contesting the material allegations of a petition filed against or it in any such proceeding, or shall seek a consent to or acquiesce in the appointment of any trustee or receiver of itself or of all or any substantial portion of its properties, or if a court having jurisdiction in the premises shall enter a decree or order for relief in respect of it in an involuntary case under any applicable bankruptcy or insolvency law, or if within sixty days after the commencement of any action against it seeking any reorganization, arrangement, composition or readjustment under any law, such action shall not have been dismissed or all orders or proceedings thereunder affecting its operations shall not have been stayed or if within 30 days after the appointment of any trustee or receiver of him or it or of all or any substantial portion of its or its properties, such appointment shall not have been vacated.

(c)     The Company may terminate this Franchise Agreement at any time if the Franchisee defaults in the payment of any amounts due to the Company under this Agreement or in

connection with the purchase of the Franchise, if such default is not cured within 30 days following written notice from the Company to the Franchisee demanding payment of such defaulted amount, or if the Franchisee defaults in or breaches any of its obligations under this Franchise Agreement (other than the payment of money) including, without limitation:

(i)     if the installed MDT is removed from the Franchisee's vehicle without the prior written authorization of the Company; or

(ii)    if the installed MDT or Radio is transferred to any other vehicle without the prior written authorization of the Company; or

(iii)   if the installed MDT is repaired by any party other than an authorized service center designated in writing by the Company; or

(iv)    if the marker identifying the Company as the owner of the MDT or the Radio is removed without the prior written authorization of the Company; or

(v)     if the MDT or the Radio or the Franchise is pledged, encumbered, used as collateral, subjected to a lien or used as a security interest without the prior written authorization of the Company; or

(vi)    if the Franchisee fails to pay for the removal or transfer of the installed MDT upon an assignment of the Franchise; or

(vii)   if the Franchisee fails to maintain all insurance coverage required under this Franchise Agreement; or

(viii)  if the Franchisee permits any other entity, including without limitation any person, partnership or corporation, to use the Radio or the MDT or the services of the Company without the prior written authorization of the Company; or

(ix)    if in the use of the Franchise there is substantial or repeated violations of any of the Company's rules or regulations as set forth in the Manual; or

(x)     if the Franchisee fails to maintain a clean vehicle in good operating condition which shall be no more than five model years old, and or fails to offer courteous and efficient services, as required by the Manual and this Franchise Agreement; or

(xi)    if the Franchisee or its officers, directors, or agents (including drivers) communicates with or offers or provides transportation services to any of the Company's customers other than in conjunction with the Company's business; or

(xii)   if at any time the Franchisee fails to indemnify and hold the Company harmless as required under this Franchise Agreement; or

(xiii)  if the Franchisee repeatedly fails to provide an authorized vehicle on

an every day basis for the required period of time each day for use in connection with Company's Business without first notifying the Company; or

(xiv)   if the Franchisee fails to comply with any law, rule, regulation, ordinance, order, or directive of any governmental, quasi-governmental department, agency, commission, board or body asserting authority over the Company and/or the Franchisee.

(xv)   if a Franchisee's driver fails to offer courteous service to a customer; or

(xvi)   if the Franchisee submits any false billing information to the Company or steals or otherwise converts any property belonging to or any service provided by the Company; or

(xvii)   if the Franchisee's officers, directors, stockholders, or drivers threaten or commit any violence toward another Franchisee's officers, directors, stockholders, or drivers or toward ay officer, employee, or agent of the Company; or

(xviii)   if the Company's logo and name is not properly displayed on Franchisee vehicle; or

(xix)   if the Franchisee fails to report an accident to the Company; or

(xx)   if a Franchisee breaches any other or its obligations under this Agreement.

Termination of this Franchise shall not be the Company's exclusive remedy, and the Company shall have other and different remedies including, but not limited to, the suspension of some or all of Franchisee's rights hereunder and the imposition of assessments and fines.

12.   <u>Damages and Other Obligations</u>

(a)   Upon termination of this Franchise Agreement by the Franchisee following a material breach of, or default under, this Franchise Agreement by the Company, the Franchisee shall be entitled to receive from the Company an amount determined by multiplying (x) the difference between the number of years constituting the full term of this Franchise Agreement not to exceed twenty, and the number of full years of the Term that elapsed prior to termination of this Franchise Agreement by the Franchisee, by (y) a fraction, the numerator of which is the Franchise Fee and the denominator of which is the full term of this Franchise Agreement, not to exceed twenty years. The amount, if any, so determined shall constitute the sole damages to which the Franchisee shall be entitled as a result of a material breach of, or default under, this Franchise Agreement by the Company. The Company shall be entitled to offset any amount owed to the Franchisee under this Section by any principal and interest then remaining owing under the Note.

(b)   Upon termination of this Franchise Agreement following a breach or default

by the Franchisee, the Company shall be entitled to retain the Franchise Fee and in addition shall be entitled to damages, which shall include, without limitation, the following:

(i)     Weekly Fees for each week that the MDT and Radio remain in the possession of the Franchisee;

(ii)     Any costs incurred or paid in connection with the removal, repair, and reinstallation and or replacement of the MDT; and

(iii)     Reasonable expenses, including, without limitation, attorneys' fees, disbursements and court costs incurred or paid in connection with the termination of the Franchise Agreement and the recovery, removal, reinstallation, and or replacement of the MDT and Radio.

(c)     Upon termination of this Franchise Agreement following a breach or default by the Franchisee, the Franchisee shall continue to be obligated: under Section 6.2 hereof to return the Radio to the Company; under Section 6.13 not to offer transportation services to the Company's customers; under Section 9 to indemnify and hold the Company harmless; under Sections 3 and 6.6 to continue payments, if any, due to the Company.  In addition to the foregoing continuing obligations, the Franchisee will continue to be obligated to pay all monies due to the Company irrespective of the reason therefor and shall be required to remove all logos and service marks bearing the words "Golden Touch" or "Golden Airport Express" or other proprietary logo or mark of the Company.

13.     Notices

All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given when personally delivered or mailed by registered or certified mail, to the addresses herein designated, or at such other address as may be designated by notice to the other party.  If to the Franchisee, at the address given in the prefatory Section of this Agreement; and if to the Company, Golden Touch Transportation of NY, Inc., 109-15 14th Avenue, Flushing, New York 11356, Attn: Thomas Herrschaft, with copies to: Schlam Stone & Dolan LLP, 26 Broadway, 19th Floor, New York, New York 10004, Attn: Wayne I. Baden, Esq.

14.     Amendments and Entire Agreement

(a)     This Franchise Agreement contains the entire agreement between the parties hereto with respect to the transactions contemplated hereby and supersedes all prior understandings, representations, warranties, promises and undertakings made orally or in writing between the parties.

(b)     All Franchise Agreements may be amended upon the consent of the Company and the consent of a majority of Franchisees who have submitted vouchers to the Company or its agents within the twelve month period prior to the delivery of notice of the Company's or the Franchisees' intention to amend all Franchise Agreements.  Such consents may be in writing or may be given at a meeting of Franchisees called on proper notice given at least ten (10) days prior to such

meeting. Such meetings shall be held in the City of New York. Each amendment properly consented to shall be binding on all Franchisees even if they did not consent thereto.

(c)     This Franchise Agreement may also be changed or modified by a written instrument executed by the parties hereto.

15.   Parties in Interest

This Franchise Agreement shall inure to the benefit of and be binding upon the parties named herein and their respective successors and assigns; provided, any assignment by the Franchisor is made pursuant to the terms and conditions set forth in this Franchise Agreement. In the event of the death or incapacity of a shareholder of the Franchise, an individual, this Franchise Agreement shall inure to the benefit of the shareholder's heirs or personal representatives pursuant to the terms and conditions set forth in this Franchise Agreement.

16.   Law to Govern

This Franchise Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to conflict of laws and rules. All actions, suits, and proceedings not covered by arbitration in Section 20 hereof, must be commenced and heard in the state and federal courts located in New York County, State of New York.

17.   No Waiver, Cumulative Remedies

No failure or delay on the part of any party hereto in exercising any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power or remedy preclude any other further exercise thereof or the exercise of any other right, power or remedy hereunder.  The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law.

18.   Severability

If any part of this Franchise Agreement is found to be contrary to public policy or declared invalid for any reason such a finding or declaration shall not invalidate any other part of this Franchise Agreement.

19.   Section and Other Heading

The section and other headings contained in this Franchise Agreement are for reference purposes only and shall not affect the interpretation or meaning of this Franchise Agreement.

20.    Arbitration In Certain Circumstances

The sole and exclusive method of resolving any claim or controversy whatsoever between the parties herein or between the Company and the driver of Franchisee, unless otherwise specified in this agreement or in any other written agreement between the parties, shall be binding arbitration according to the procedures set forth in this section. Disputes which shall be subject to binding arbitration shall include but shall not be limited to: (i) the amount of payment for or deduction from Franchisee's or Franchisee's driver's voucher payments; (ii) any monetary fine assessed against a Franchisee or Franchisee's driver pursuant to Rules and Regulations promulgated under the Franchise Agreement or related Contract for Service Agreement or (iii) any claim for discrimination of work offered to Franchisee or Franchisee's driver. The procedure to be followed by the Franchisee or Franchisee's driver with respect to any controversy set forth in subsection (i), (ii) or (iii) of this paragraph shall be the following: in each instance, Franchisee or Franchisee's driver shall first submit such claim or controversy to Director of Franchise Relations of the Company and if the aggrieved Franchisee or Franchisee's driver is not satisfied by the decision of the Director of Franchise Relations of the Company, then Franchisee or Franchisee's driver shall submit the same to binding arbitration conducted by a single arbitrator and administered by the American Arbitration Association under its Commercial Arbitration Rules, or by such other independent and impartial organization as may be designated by the Company, and the determination rendered by the arbitrator shall be final and may be entered in any court having jurisdiction over the parties. In any claim or controversy not within the scope of subsection (i), (ii) or (iii) of this paragraph, submission to the Director of Franchise Relations of the Company shall not be required. In any arbitration hereunder each party shall bear its own expenses, including legal fees; provided, however, that in the event Franchisee or Franchisee's driver recovers more than two-thirds of the amount in controversy, the Company shall reimburse Franchisee's or Franchisee's driver's filing fees but no other expenses or fees. An arbitrator shall have the authority to award compensatory damages only. This section shall not apply to any claim or cause brought by the Company to enforce a non-competition agreement between the parties herein or between the Company and a driver of Franchisee, or to any termination of this Agreement, or to any suspensions of an individual's right to operate the Franchise as a driver. Each claim or controversy required to be arbitrated pursuant to this provision must be submitted in writing first to the Director of Franchise Relations of the Company within 60 days after the date the claim or controversy arose (if such submission is required), and must be submitted to arbitration in accordance with the applicable arbitration rules within one hundred and eighty (180) days after the date the Director of Franchise Relations of the Company renders final determination on such claim or controversy or within 180 days from the date the claim or controversy arose if submission to the Director of Franchise Relations of the Company is not required by this section. These limitations on the time for submitting claims and controversies shall be applicable to such claims and controversies notwithstanding any longer period that may be provided by statute or the Commercial Arbitration Rules, and failure to submit such claims and controversies in a timely manner shall be a complete bar to such claims or controversies. The Arbitrator shall decide any controversy hereunder in accordance with: the terms of this Agreement, the rules promulgated by the Company, and the substantive law of the State of New York.

21.    Waiver of Trial By Jury

To the extent permitted by law, the respective parties hereto hereby waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Franchise Agreement or breach thereof for any claim of damage resulting from any act or omission of the parties in any way connected with this Franchise Agreement. Franchisee and Company hereby submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York and any New York State court sitting in New York County for the purposes of any legal proceeding arising out of or relating in any way to this Agreement, and each agrees that any such action shall be brought in one of such courts. Franchisee also irrevocably waives, to the fullest extent permitted by law, any objection which it may have to the laying of venue in any such court and any claim that any proceeding brought in any such court has been brought in an inconvenient forum.

22.   Assignment by the Company

The Company shall have the right, in its sole discretion, to assign the Franchise Agreement or all or any of its obligations and rights thereunder provided that the assignee of the Company's obligations under such assignment is, in the Company's reasonable judgment, able to perform the Company's obligations under this Agreement. Upon such assignment, the Company shall have no further liability to Franchisee for the obligations assigned.

IN WITNESS WHEREOF, the parties hereto have caused this Franchise Agreement to be duly executed as of the day and year first written above.

GOLDEN TOUCH TRANSPORTATION OF NY, INC.

BY: _____

LOKEKO INC., FRANCHISEE

BY: _____
Konstantin Dergunov, President