D/F

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X
DMITRIY SEREBRYAKOV and
DMITRIY KURAMYSHEV, individually and on
behalf of other similarly situated persons,

                      Plaintiffs,

       -against-

GOLDEN TOUCH TRANSPORTATION OF NY,
INC., LOKEKO, INC., DOUBLE "K" USA, CORP.,
and KONSTANTIN DERGUNOV,

                      Defendants.
-------------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**12-CV-3990 (NGG) (RER)**

NICHOLAS G. GARAUFIS, United States District Judge.

      Plaintiffs Dmitriy Serebryakov and Dmitriy Kuramyshev (collectively, "Plaintiffs") bring

this putative class action against Double "K" USA, Corp. ("Double K"), Lokeko Inc.

("Lokeko"), and Konstantin Dergunov (collectively, "Defendants").[1]  Plaintiffs, commercial

drivers, claim Defendants have failed to pay Plaintiffs for overtime work in violation of the Fair

Labor Standards Act ("FLSA"), 29 U.S.C. §§ 207, et seq., and article 19 of the New York Labor

Law.  Defendants move to compel arbitration pursuant to section 4 of the Federal Arbitration Act

("FAA"), 9 U.S.C. § 4.  (Defs.' Mot. to Compel Arbitration ("Mot.") (Dkt. 42).)  For the reasons

set forth below, Defendants' motion is DENIED.

## I.    BACKGROUND

###     A.    The Parties

      Plaintiffs are residents of Kings County, New York.  (Compl. (Dkt. 1) ¶¶ 11-12.)

Defendant Konstantin Dergunov is the owner and president of co-Defendants Double K and

Lokeko, two transportation companies incorporated in New York and providing New York City

---

[1] Plaintiffs have settled their claims against Defendant Golden Touch Transportation of NY, Inc. ("GTT").  (See
July 10, 2013, Order (Dkt. 37).)

metropolitan-area airport transportation services. (Mot. at 1; Decl. of Konstantin Dergunov ("Dergunov Decl.") (Mot., Ex. 4 (Dkt. 42-4)) ¶ 2.) Each Plaintiff alleges that he was employed by Defendants as an "Airport Transportation Driver," and was paid either by Double K or Lokeko. (Compl. ¶¶ 11-12, 17.) Plaintiff Serebryakov alleges that he worked for Defendants from sometime in 2011 until April 2012; Plaintiff Kuramyshev alleges that he worked for Defendants from sometime in 2010 until July 2012. (Id. ¶¶ 11-12.) The parties have not indicated whether the relationships between Plaintiffs and Defendants are subject to any written contract or employment agreement.

While Plaintiffs describe themselves as "employees" within the meaning of the FLSA, Defendants contend that Plaintiffs were independent contractors. (Compare id. ¶ 38, with Dergunov Decl. ¶ 5.) Nonetheless, Plaintiffs allege that Defendants denied them overtime pay for hours worked in excess of forty hours per week, in violation of the FLSA and article 19 of the New York State Labor Law and its implementing regulations. (Compl. ¶ 3.) Plaintiffs bring these allegations on behalf of themselves as well as others they believe to be similarly situated. (Id.)

### B. The Relevant Agreements

Between 2003 and 2008, Defendants Double K and Lokeko entered into a number of Franchise Agreements ("FAs") with Franchisor Golden Touch Transportation of NY, Inc. ("GTT"). (Arbitration Agreements, Exs. 1-3 (Dkts. 48-1, 48-2, 48-3).) Pursuant to these agreements, Defendants, as "Franchisee," were permitted to use GTT's trade name, two-way radio dispatch network, and certain other products and services of GTT.[2] (See, e.g., Arbitration

---

[2] According to Defendants, the terms and conditions of this franchise relationship are governed by three separate franchise agreements: (1) a 2003 FA between Double K and GTT; (2) a 2005 FA between Double K and GTT; and (3) a 2008 FA between Lokeko and GTT. (Dergunov Decl. ¶ 3). For the purpose of this Memorandum and Order, the three FAs are substantively identical in all pertinent respects.

Agreements, Ex. 1 ("June 13, 2008, FA") (Dkt. 48-1) ¶ 1.)  Only GTT and Defendant

corporations, through Dergunov's signature, are signatories to the FAs.  (See, e.g., id. at 16.)

　　　The FAs include a provision entitled "Arbitration In Certain Circumstances" (the

"Arbitration Clause").  The provision provides, in part:

> The sole and exclusive method of resolving any claim or
> controversy whatsoever between the parties herein or between the
> Company and the driver of Franchisee, unless otherwise specified
> in this agreement or in any other written agreement between
> parties, shall be binding arbitration according to the procedures set
> forth in this section.

(Id. ¶ 20 (emphasis added)).  The Arbitration Clause also establishes procedures governing the

arbitration of disputes within the purview of the Arbitration Clause.  (See id.)  The FAs identify

GTT as the "Company," and Defendant corporations as the "Franchisee."  (See, e.g., id. at 1.)

Nonetheless, the FAs do not define the term "parties."  There is also no evidence of any other

written agreement.

　　　Plaintiffs, who are not signatories, claim that they were never made aware of the FAs.

(Pls.' Mem. in Opp'n to Defs.' Mot. ("Opp'n") (Dkt. 43) at 1.)  Dergunov maintains, however,

that he showed the FAs to Plaintiffs and discussed the contents of the FAs with Plaintiffs as well.

(Dergunov Decl. ¶ 7.)  Specifically, Dergunov contends that he explained to Plaintiffs that they

would be subject to the FAs "just as [he] was."  (Id.)  Dergunov also claims that his

understanding was that the FAs provided for the arbitration of any dispute between "any other

individual and [himself] or GTT."  (Id. ¶ 8.)

**C.    Procedural History**

　　　On August 8, 2012, Plaintiffs filed their Complaint on behalf of themselves and other

similarly situated drivers, seeking declaratory and injunctive relief, unpaid wages, and unpaid

overtime, among other relief.  (Compl. ¶ 1.)  Plaintiffs subsequently entered into a settlement

3

resolving their claims against GTT, and this court dismissed those claims with prejudice. (July 10, 2013, Order (Dkt. 37).) On April 24, 2014, Defendants filed the instant motion to compel arbitration, arguing that Plaintiffs are bound by the FAs, and thus Plaintiffs' claims are subject to the Arbitration Clause, which—according to Defendants—does not permit class-wide arbitration. (Mot. at 20.) Plaintiffs responded on May 30, 2014, insisting that they could not have agreed to arbitrate with Defendants not only because they are not parties to the FAs, but also because they were not even aware of the FAs, although they knew that Defendants did not own GTT. (See Opp'n at 1.) Moreover, Plaintiffs contend that even if they are bound to the Arbitration Clause, Defendants' motion should be denied because FLSA claims are not arbitrable, and any implied waiver of class-wide arbitration is unconscionable and therefore unenforceable. (See id.) Defendants did not submit any reply.

## II.   DISCUSSION

Defendants move pursuant to 9 U.S.C. § 4 to compel arbitration of all claims asserted in Plaintiff's Complaint.[3] Under section 4, a party "aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration" may file a motion to compel, which a court may grant "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." See AT&T Mobility LLC v. Concepcion, 131 S. Ct. 1740, 1748-49 (2011) (citing 9 U.S.C. § 4).

### A.   Legal Standard

Thus, a motion to compel arbitration requires the court to address two preliminary issues: (1) whether the parties have entered into a valid agreement to arbitrate; and (2) if so, whether the

---

[3] The FAA empowers district courts to compel arbitration, but only where the court has an independent basis for maintaining jurisdiction. See Scandinavian Reins. Co. Ltd. v. St. Paul Fire & Marine Ins. Co., 668 F.3d 60, 71 (2d Cir. 2012). Here, Plaintiffs allege claims arising under both the FLSA and the New York Labor Law. As a result, the court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. See, e.g., Chen v. Major League Baseball, 6 F. Supp. 3d 449, 461 n.12 (S.D.N.Y. 2014).

dispute at issue falls within the scope of the parties' agreement to arbitrate. See In re Am. Express Fin. Advisors Sec. Litig., 672 F.3d 113, 128 (2d Cir. 2011); see also Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287, 299 (2010) ("[C]ourts should order arbitration of a dispute only where the court is satisfied that neither the formation of the parties' arbitration agreement nor (absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is in issue."). While the FAA establishes a "liberal federal policy favoring arbitration agreements," see, e.g., CompuCredit Corp. v. Greenwood, 132 S. Ct. 665, 669 (2012), "'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" Am. Express Fin. Advisors, 672 F.3d at 127 (quoting Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002)); see also Am. Express Co. v. Italian Colors Rest., 133 S. Ct. 2304, 2309 (2013) (noting "courts must rigorously enforce arbitration agreements according to their terms" (internal quotation marks omitted)).

In deciding motions to compel arbitration brought under section 4, the court applies a standard similar to that applicable to a motion for summary judgment. Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003); see also Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd., 661 F.3d 164, 172 (2d Cir. 2011) ("If there is a genuinely disputed factual issue whose resolution is essential to the determination of the applicability of an arbitration provision, a trial as to that issue will be necessary; but where the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, we may rule on the basis of that legal issue and 'avoid the need for further court proceedings.'" (quoting Bensadoun, 316 F.3d at 175)). As a result, allegations related to arbitrability are evaluated to determine "whether they raise a genuine issue of material fact that

5

must be resolved by a fact-finder at trial." Schnabel v. Trilegiant Corp., 697 F.3d 110, 113 (2d Cir. 2012). In addition, "[t]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." Green Tree Fin. Corp.-Ala. v. Randolph, 531 U.S. 79, 91 (2000); see also Whitehaven S.F., LLC v. Spangler, No. 13-CV-8476 (ER), 2014 WL 4494168, at *6 (S.D.N.Y. Sept. 10, 2014) ("Whether it argues that arbitration is improper because the arbitration agreement is invalid under a defense to contract formation, or asserts that the arbitration contract does not encompass the claims at issue, either way, the resisting party shoulders the burden of proving its defense." (internal quotation marks omitted)).

The first question—whether the parties have agreed to arbitrate in the first place—"is one only a court can answer, since in the absence of any arbitration agreement at all, questions of arbitrability could hardly have been clearly and unmistakably given over to an arbitrator." VRG Linhas Aereas S.A. v. Matlin Patterson Global Opportunities Partners II L.P., 717 F.3d 322, 326 n.2 (2d Cir. 2013) (internal quotation marks omitted); see also Schnabel, 697 F.3d at 118 ("Inasmuch as the arbitrator has no authority of any kind with respect to a matter at issue absent an agreement to arbitrate, the question of whether such an agreement exists and is effective is necessarily for the court and not the arbitrator.").

The second question, if the court determines that the parties have formed a valid agreement to arbitrate, is whether the scope of that agreement covers the parties' dispute. "Courts presume that the parties intend courts, not arbitrators, to decide . . . disputes about 'arbitrability.'" BG Grp., PLC v. Republic of Argentina, 134 S.Ct. 1198, 1206 (2014). Thus, unless the parties have "clearly and unmistakably" delegated to an arbitrator the authority to resolve issues of arbitrability, Howsam, 537 U.S. at 83, "the question of whether or not a dispute is arbitrable is one for the court." Citigroup Global Mkts. Inc. v. Abbar, 761 F.3d 268, 274 (2d

6

Cir. 2014) (internal quotation marks omitted). Where courts have the authority to make this determination, the federal policy in favor of arbitration "requires that any doubts concerning the scope of arbitrable issues be resolved in favor of arbitration." Telenor Mobile Commc'ns AS v. Storm LLC, 584 F.3d 396, 406 (2d Cir. 2009) (internal quotation marks omitted). Nevertheless, the FAA "'does not require parties to arbitrate when they have not agreed to do so.'" Schnabel, 697 F.3d at 118 (quoting Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ., 489 U.S. 468, 478 (1989)).

### B. Application

As the party resisting arbitration, Plaintiffs bear the burden of proving their claims are unsuitable for arbitration. Accordingly, Plaintiffs first argue that as nonsignatories to the FAs, they never agreed to arbitrate any claim against any party. (See Opp'n at 16-17.) Second, Plaintiffs argue that even if they are in fact bound by these agreements, the Arbitration Clause does not cover their claims against these particular Defendants. (See Opp'n at 15 ("[T]he scopes [sic] of the arbitration agreement have no bearing on the Plaintiffs, and only possibly may have an effect on the Plaintiffs if the litigation was against the [F]ranchisor, which it no longer is.").)[4]

#### 1. Agreement to Arbitrate

While arbitration agreements "must not be so broadly construed as to encompass . . . parties that are not intended by the original contract," Thomson-CSF, S.A. v. Am. Arbitration Ass'n, 64 F.3d 773, 776 (2d Cir. 1995), "it does not follow . . . that . . . an obligation to arbitrate attaches only to one who has personally signed the written arbitration provision." Id. (internal

---

[4] Plaintiffs indicated that they were unable to properly respond to Defendants' motion as a result of Defendants' failure to include the FAs with their motion. (See Opp'n at 15.) As a result, Defendants were ordered to produce "the referenced arbitration agreement." (June 24, 2014, Scheduling Order.) In response, however, Defendants only produced a portion of one of the three relevant FAs. (See Arbitration Agreement (Dkt. 44).) It was not until Defendants were ordered a second time to produce all three FAs in their entirety (see Feb. 17, 2015, Order), that Defendants eventually provided complete versions to the court. (See Arbitration Agreements (Dkt. 48).) Accordingly, Plaintiffs never had the benefit of full access to the FAs in the course of briefing their opposition.

7

quotation marks omitted). Instead, nonsignatories can be bound to others' arbitration agreements through ordinary common law principles of contract and agency law. See id. The Second Circuit has recognized at least five theories pursuant to which arbitration agreements may be enforced against nonsignatories, including: "(1) incorporation by reference; (2) assumption; (3) agency; (4) veil piercing/alter-ego; and (5) estoppel." Merrill Lynch Inv. Managers v. Optibase, Ltd., 337 F.3d 125, 129 (2d Cir. 2003) (internal quotation marks omitted).

It is clear that Plaintiffs are not signatories to the FAs. (See generally Arbitration Agreements.) Defendants argue, however, that the FAs may be enforced against Plaintiffs under a theory of estoppel, since Plaintiffs are direct beneficiaries of the FAs. (Mot. at 10.) Specifically, Defendants point out that although Plaintiffs allege they are owed wages for the transportation services they provided, Plaintiffs were only able to provide these services by virtue of the FAs, which permit Plaintiffs to be subcontracted as drivers and use GTT's trade name and dispatch system. (Id. at 11.) In response, Plaintiffs maintain that estoppel is inapplicable because they had never seen the FAs, and—more generally—they were not aware the FAs existed at all. (See Opp'n at 16-17.) Plaintiffs further contend that estoppel does not apply in this case, where Plaintiffs are not attempting to enforce any part of the FAs, and the current dispute is over "a breach of the Employer[']s Duties." (Id. at 17; see also June 13, 2008, FA ¶ 7 ("Franchisee shall be responsible for complying with applicable governmental regulations and for paying its drivers, lessees and agents.").)

While at least one district court in another circuit has found that nonsignatory plaintiffs in similar circumstances may be bound to contracts as direct third-party beneficiaries, see Kairy v. Supershuttle Int'l, Inc., No. 08-CV-2993 (JSW), 2012 WL 4343220, at *9 (N.D. Cal. Sept. 20, 2012), the court need not, and thus does not, decide whether these Plaintiffs may be

estopped from resisting arbitration pursuant to the relevant provision in the FAs. As the following discussion illustrates, even if Plaintiffs are bound by the FAs, the court finds that the scope of the Arbitration Clause does not extend to the present dispute between these particular parties.

2.      Scope of the Arbitration Clause

Just as courts "presume that the parties intend courts, not arbitrators, to decide . . . disputes about 'arbitrability,'" such as "'whether the parties are bound by a given arbitration clause,'" this same presumption applies to the question of "'whether an arbitration clause in a concededly binding contract applies to a particular type of controversy.'" BG Grp., 134 S. Ct. at 1206 (quoting Howam, 537 U.S. at 84; citing AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 649 (1986) (holding that a court should decide whether a particular labor-management dispute fell within the arbitration clause of a collective-bargaining agreement)). Under this framework, the question of arbitrability is "'an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise.'" Howsam, 537 U.S. at 83 (quoting AT&T Techs., 475 U.S. at 649). While the very last sentence of the Arbitration Clause provides that "[t]he Arbitrator shall decide any controversy hereunder" (June 13, 2008, FA ¶ 20), neither party argues that this language empowers the arbitrator to decide the scope of the Arbitration Clause. (See Mot. at 12-13; Opp'n at 1-2.) As a result, there is no need to apply the "clear and unmistakable evidence" rule to establish that the question of scope is one for this court to decide. See Granite Rock, 561 U.S. at 297 n.5.

The Second Circuit has provided clear guidance to courts analyzing the language of an arbitration clause to determine its scope:

> To determine whether a particular dispute falls within the scope of an agreement's arbitration clause, a court should

9

> undertake a three-part inquiry.  First, recognizing there is some
> range in the breadth of arbitration clauses, a court should classify
> the particular clause as either broad or narrow.  See Mehler v.
> Terminix Int'l Co., 205 F.3d 44, 49 (2d Cir. 2000); Peerless Imps.,
> Inc. v. Wine, Liquor & Distillery Workers Union Local One, 903
> F.2d 924, 927 (2d Cir. 1990); McDonnell Douglas Fin. Corp. v. Pa.
> Power & Light Co., 858 F.2d 825, 832 (2d Cir. 1988).  Next, if
> reviewing a narrow clause, the court must determine whether the
> dispute is over an issue that "is on its face within the purview of
> the clause," or over a collateral issue that is somehow connected to
> the main agreement that contains the arbitration clause.  Rochdale
> Vill., Inc. v. Pub. Serv. Employees Union, 605 F.2d 1290, 1295
> (2d Cir. 1979); see also Prudential Lines, Inc. v. Exxon Corp., 704
> F.2d 59, 64 (2d Cir. 1983).  Where the arbitration clause is narrow,
> a collateral matter will generally be ruled beyond its purview.  See
> Cornell Univ. v. UAW Local 2300, 942 F.2d 138, 140 (2d Cir.
> 1991).  Where the arbitration clause is broad, "there arises a
> presumption of arbitrability" and arbitration of even a collateral
> matter will be ordered if the claim alleged "implicates issues of
> contract construction or the parties' rights and obligations under
> it."  Collins & Aikman Prods. Co. v. Bldg. Sys., Inc., 58 F.3d 16,
> 23 (2d Cir. 1995).

Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc., 252 F.3d 218, 224

(2d Cir. 2001); see also id. ("We think making a distinction between broad and narrow

arbitration clauses is necessary and sound, as the 'scope of an arbitration clause, like any other

contract provision, is a question of the intent of the parties.'  When parties use expansive

language in drafting an arbitration clause, presumably they intend all issues that 'touch matters'

within the main agreement to be arbitrated, while the intended scope of a narrow arbitration

clause is obviously more limited." (quoting S.A. Mineracao da Trindade-Samitri v. Utah Int'l,

Inc., 745 F.2d 190, 193 (2d Cir. 1984); Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 846

(2d Cir. 1987))).

　　　Yet "[n]o fixed rules govern the determination of an arbitration clause's scope."  Id.

at 225.  The scope of an arbitration clause, "like any contract provision, is a question of the intent

of the parties."  McDonnell Douglas, 858 F.2d at 831; see also Mitsubishi Motors Corp. v. Soler

Chrysler-Plymouth, Inc., 473 U.S. 614, 626 (1985) ("[A]s with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability."). "[W]hile very expansive language will generally suggest a broad arbitration clause," Louis Dreyfus, 252 F.3d at 225 (citing Collins, 58 F.3d at 18 ("Any claim or controversy arising out of or relating to this agreement shall be settled by arbitration.")), the Second Circuit has "also found broad clauses when examining phrasing slightly more limited," id. (citing Abram Landau Real Estate v. Bevona, 123 F.3d 69, 71 (2d Cir. 1997) ("Contract Arbitrator shall have the power to decide all differences arising between the parties to this agreement as to interpretation, application or performance of any part of this agreement.")).

Ultimately, courts must determine whether "the language of the clause, taken as a whole, evidences the parties' intent to have arbitration serve as the primary recourse for disputes connected to the agreement containing the clause, or if . . . arbitration was designed to play a more limited role in any future dispute." Id. While the "strong federal presumption in favor of arbitration dictates that doubts as to arbitrability should be resolved in favor of coverage," "it is equally clear that 'federal policy alone cannot be enough to extend the application of an arbitration clause far beyond its intended scope.'" McDonnell Douglas, 858 F.2d at 831 (quoting Fuller v. Guthrie, 565 F.2d 259, 261 (2d Cir. 1977)). "[T]hough even a narrow arbitration clause must be construed in light of the presumption in favor of arbitration, the court is not free to disregard the explicit boundaries set by the agreement between the parties." Chevron U.S.A. Inc., by & Through Chevron Res. Co. v. Consol. Edison Co. of N.Y., 872 F.2d 534, 537-38 (2d Cir. 1989).

> a.    Is the Arbitration Clause Broad or Narrow?

The question of whether this Arbitration Clause is broad or narrow is not as straightforward as Defendants claim it is. (Cf. Mot. at 12-13.) On the one hand, some of the

language used in the Arbitration Clause is obviously broad.  Most significantly, the Arbitration

Clause applies to "any claim or controversy whatsoever." (June 13, 2008, FA ¶ 20.)  This

particular formulation of the substantive scope of the provision is undeniably one that might

justify a strong presumption of arbitrability.  See, e.g., Prima Paint Corp. v. Flood & Conklin

Mfg. Co., 388 U.S. 395, 406 (1967) (provision requiring arbitration of "[a]ny controversy or

claim arising out of or relating to this Agreement, or the breach thereof" was "easily broad

enough to encompass [plaintiff]'s claim"); JLM Indus., Inc. v. Stolt-Nielsen SA, 387

F.3d 163, 172 (2d Cir. 2004) (clause requiring arbitration for "[a]ny and all differences and

disputes of whatsoever nature arising out of this Charter" was "at least as expansive as the

language contained in a number of arbitration clauses that this Court has characterized as

'broad'"); Oldroyd v. Elmira Sav. Bank, FSB, 134 F.3d 72, 76-77 (2d Cir. 1998) (characterizing

clause making arbitrable "[a]ny dispute, controversy or claim arising under or in connection with

[the employment agreement]" as a "prototypical broad arbitration provision"); Collins, 58 F.3d

at 20 ("The clause in this case, submitting to arbitration '[a]ny claim or controversy arising out

of or relating to th[e] agreement,' is the paradigm of a broad clause." (alterations in original));

Reid v. Supershuttle Int'l, Inc., No. 08-CV-4854 (JG) (VVP), 2010 WL 1049613, at *5

(E.D.N.Y. Mar. 22, 2010) (broadly construing arbitration clause governing "any controversy

arising out of this Agreement").

On the other hand, the very same sentence also contains significant words of limitation,

confining "any claim or controversy whatsoever" to those "between the parties herein or between

the Company and the driver of Franchisee." (June 13, 2008, FA ¶ 20.)  Given this unambiguous

qualification,[5] the scope of the Arbitration Clause is not as unlimited as the "any claim or

---

[5] "Contract language is ambiguous if it is capable of more than one meaning when viewed objectively by a
reasonably intelligent person who has examined the context of the entire integrated agreement." Compagnie

controversy whatsoever" language initially suggests. In these circumstances, the Second Circuit has cautioned that "[s]pecific words or phrases alone may not be determinative although words of limitation would indicate a narrower clause. The tone of the clause as a whole must be considered." Prudential Lines, 704 F.2d at 64. For example, in Rochdale, the relevant clause required arbitration of "any and all disputes hereunder." 605 F.2d at 1296 (emphasis added). The court concluded, "The arbitration clause . . . is broad, but it is not unlimited." Id. It reasoned that "[t]he insertion of the word 'hereunder' after the otherwise all-inclusive phrase 'any and all disputes' has the effect of limiting, albeit slightly, the parties' duty to arbitrate." Id. The Second Circuit later observed that this language represented a "slightly" narrow arbitration clause, which therefore did not govern collateral matters. See ACE Capital Re Overseas Ltd. v. Cent. United Life Ins. Co., 307 F.3d 24, 35 (2d Cir. 2002) (Sotomayor, J.) (citing Rochdale, 605 F.2d at 1296); accord Alfa Laval U.S. Treasury Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 857 F. Supp. 2d 404, 410 (S.D.N.Y. 2012) (holding clause requiring arbitration of "[a]ll disputes or differences arising out of the interpretation of" the agreement was narrow (emphasis added)).

That its phrasing is more limited, however, does not necessarily mean that the Arbitration Clause is "narrow" as that label is applied in this circuit. In fact, the court has identified several cases in which provisions requiring arbitration for "any claim or controversy between the parties," or some variation thereof, were nonetheless found to constitute "broad" arbitration clauses. See Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc., 369 F.3d 645, 649 (2d Cir. 2004) (clause requiring arbitration for "any controversy, claim or dispute between the Parties arising out of or relating in any way to this Agreement" was "of

---

Financiere de CIC et de L'Union Europeene v. Merrill Lynch, Pierce, Fenner & Smith, 232 F.3d 153, 158 (2d Cir. 2000).

the broad type"); <u>Vera v. Saks & Co.</u>, 335 F.3d 109, 117 (2d Cir. 2003) (language in collective bargaining agreement requiring arbitration of "[a]ny dispute, claim, grievance or difference arising out of or relating to this Agreement which the Union and the Employer have not been able to settle" constituted a broad arbitration clause); <u>ACE Capital</u>, 307 F.3d at 27, 33-34 (clause requiring arbitration "if any dispute shall arise between the parties hereto with reference to the interpretation of this Agreement or their rights with respect to any transaction involved" was broad); <u>Mehler</u>, 205 F.3d at 49-50 ("There is no dispute that the arbitration clause at issue is a classically broad one. The clause provides for arbitration of 'any controversy or claim between [the parties] arising out of or relating to' the Agreement." (alteration in original) (citing <u>Oldroyd</u>, 134 F.3d at 76)); <u>Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Simth Cogeneration Int'l, Inc.</u>, 198 F.3d 88, 98-99 (2d Cir. 1999) (clause providing that "[a]ny Dispute that is not resolved by the parties shall be finally settled by arbitration" was broad); <u>N. River Ins. Co. v. Allstate Ins. Co.</u>, 866 F. Supp. 123, 127 (S.D.N.Y. 1994) (clause requiring arbitration "[i]f <u>any</u> dispute shall arise between the reinsured and the reinsurer with reference to the interpretation of this contract or their rights with respect to any transaction involved" was broad (emphasis and alteration in original)). These cases therefore illustrate that the determination of whether an arbitration clause is broad or narrow is ultimately a normative legal conclusion, rather than a simple descriptive exercise.

Yet not one of these cases addressed the question of whether a dispute involving a particular <u>party</u>—as opposed to a substantive issue or legal claim—fell within the scope of a broad arbitration clause. Moreover, this court has identified only one case, <u>Smith/Enron</u>, in which the Second Circuit required a nonsignatory to arbitrate a dispute governed by an arbitration clause that specifically referenced the parties to the contract. <u>See</u> 198 F.3d 88. That

14

case, however, is distinguishable on several grounds.[6] Most importantly, in Smith/Enron a nonsignatory sought—pursuant to a veil-piercing theory—to compel arbitration against a signatory. Id. at 97 ("[W]hile a court should be wary of imposing a contractual obligation to arbitrate on a non-contracting party, we do not face that concern here. . . . Normally, it is the signatory to an arbitration agreement that urges us to apply a veil-piercing doctrine to require the non-signatory to arbitrate . . . . In this case, however, it is . . . (the alleged 'non-signatories' to the contract) that invite us to pierce their own corporate veil . . . ." (citation omitted)). In the Second Circuit, the distinction between cases where nonsignatories seek to compel arbitration against signatories and cases where, as here, signatories seek to compel arbitration against nonsignatories is significant. See Thomson-CSF, 64 F.3d at 779 ("While [some] suggest[] that this is a non-distinction, the nature of arbitration makes it important. Arbitration is strictly a matter of contract; if the parties have not agreed to arbitrate, the courts have no authority to mandate that they do so.").

Additionally, the contractual language in Smith/Enron was broader than the language at issue here. Although the agreement in Smith/Enron provided that "[a]ny Dispute that is not resolved by the parties shall be finally settled by arbitration," the preceding clause defined "Dispute" as "any dispute, disagreement, controversy or claim arising under or relating to any obligation or claimed obligation under the provisions of this Agreement." Id. at 98 (emphasis added). As a result, the agreement in Smith/Enron did not explicitly limit the controversy to one between the signatories. Finally, the party resisting arbitration did not even raise the issue of

---

[6] Defendants identify one additional case, Jones v. Genus Credit Mgmt. Corp., 353 F. Supp. 2d 598 (D. Md. 2005), in which a nonsignatory was bound by an agreement requiring arbitration of "[a]ny dispute between us that cannot be amicably resolved." Id. at 602 (emphasis added). Jones, however, is distinguishable on the same grounds as is Smith/Enron. See, e.g., 353 F. Supp. 2d at 602 (noting nonsignatory defendants were seeking to enforce arbitration agreement against signatory plaintiffs). And unlike Smith/Enron, Jones has no binding effect on this court.

whether the language of the arbitration clause implicitly restricted arbitration to claims between signatories; thus, the Smith/Enron court had no occasion to consider the issue. See id. at 98-99.

Consequently, the absence of directly applicable Second Circuit case law makes it particularly difficult to characterize as broad or narrow this Arbitration Clause, which establishes arbitration as the "sole and exclusive method of resolving any claim or controversy whatsoever between the parties herein or between the Company and the driver of the Franchisee." (See June 13, 2008, FA ¶ 20 (emphasis added).)  The Arbitration Clause is clearly "broad"—as that term has been applied by courts in this circuit—with respect to the substance of the disputes it covers, but it is uniquely "narrow" with respect to the parties between whom these disputes must be arbitrated.  Therefore, it is unclear whether the court should apply the stronger presumption in favor of arbitration afforded to broad arbitration clauses. See Louis Dreyfus, 252 F.3d at 224. This challenge notwithstanding, the court need not—and does not—decide whether this clause should be characterized as "broad" or "narrow."  As the following discussion illustrates, the Arbitration Clause cannot be interpreted as including disputes between these Plaintiffs and these Defendants, even under the more generous standard applied to broad arbitration clauses. See McDonnell Douglas, 858 F.2d at 832 ("[A]s the Supreme Court has noted, the strong federal presumption in favor of arbitrability applies with greater force when an arbitration clause is a broad one." (citing AT&T Techs., 475 U.S. at 650)).

> b.    *Does the Arbitration Clause Include the Present Dispute?*

"[T]he existence of any broad agreement to arbitrate creates a presumption of arbitrability which is only overcome if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.  Doubts should be resolved in favor of coverage." Paramedics, 369 F.3d at 653 (internal quotation marks omitted); see also Mehler, 205 F.3d at 49 (citing First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 945 (1995)

16

(noting "issues will be deemed arbitrable unless it is clear that the arbitration clause has not included them" (internal quotation marks omitted))). "These are rules of construction, however, and what [courts] construe is a contract. Accordingly, federal law 'does not require parties to arbitrate when they have not agreed to do so . . . .' Federal law 'simply requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms.'" Collins, 58 F.3d at 19-20 (quoting Volt, 489 U.S. at 478); see also Rosen v. Mega Bloks Inc., No. 06-CV-3474 (LTS) (GWG), 2007 WL 1958968, at *8 (S.D.N.Y. July 6, 2007) (report and recommendation) ("That there is a "presumption" of arbitration, however, does not alter the fact that the ultimate purpose of the Court's inquiry is to determine whether the parties intended that the particular claims at issue here be arbitrated."), adopted, 2008 WL 2810208 (S.D.N.Y. July 21, 2008).

In this case, the court finds "with positive assurance" that this Arbitration Clause is not susceptible of an interpretation that it covers the dispute between these Plaintiffs and Defendants. See Paramedics, 369 F.3d at 653. "In interpreting a contract under New York law, 'words and phrases . . . should be given their plain meaning.'" ReliaStar Life Ins. Co. of N.Y. v. EMC Nat'l Life Co., 564 F.3d 81, 88 (2d Cir. 2009) (quoting LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 206 (2d Cir. 2005)).[7] The Arbitration Clause establishes that unless otherwise specified, only two types of claims or controversies are subject to arbitration: (1) those "between the parties herein," and (2) those "between the Company and the driver of Franchisee." (See June 13, 2008, FA ¶ 20.) The present action, however, is of a third type: a claim or controversy between the Franchisee (i.e., Defendants) and drivers of the Franchisee (i.e., Plaintiffs). The plain language of the Arbitration Clause, however, patently excludes disputes between these parties from its scope. (See id.) Instead, the Clause evidences an intent to resolve

---

[7] The FAs provide that New York law governs their construction. (See, e.g., June 13, 2008, FA ¶ 16.)

17

through arbitration "any claim or controversy whatsoever" in which "the Company," or GTT, is involved. (See id.) Given a likelihood that the FAs were drafted by GTT, the Franchisor, this result is not surprising.

By contrast, if the parties had intended to incorporate "any claim or controversy whatsoever," without qualification, the Arbitration Clause could easily have been drafted to manifest that intent. See Rochdale, 605 F.2d at 1296 (finding arbitration clause was "broad" but "not unlimited" where "[t]he insertion of the word 'hereunder' after the otherwise all-inclusive phrase 'any and all disputes' has the effect of limiting, albeit slightly, the parties' duty to arbitrate'"). For example, the Clause could have been drafted to require arbitration for "any claim or controversy whatsoever arising from (or arising out of) the Franchise Agreement," see, e.g., ACE Capital, 307 F.3d at 32 (noting phrase "arising from" suggests broad scope); JLM, 387 F.3d at 172 (same, for "arising out of"), or it could have been drafted to require arbitration for "any claim or controversy whatsoever, including, but not limited to, those between the parties herein or between the Company and the driver of Franchisee," see, e.g., Bank Julius Baer & Co., Ltd. v. Waxfield Ltd., 424 F.3d 278, 282 (2d Cir. 2005), abrogated on other grounds by Goldman, Sachs & Co. v. Golden Empire Schs. Fin. Auth., 764 F.3d 210, 215 n.3 (2d Cir. 2014).[8] Instead, however, the parties unambiguously chose to restrict the claims and controversies to be arbitrated to those between two sets of specifically identified parties; the court is required to enforce that choice. See Italian Colors, 133 S. Ct. at 2309 (noting "courts must 'rigorously enforce' arbitration agreements according to their terms, including terms that 'specify with whom [the parties] choose to arbitrate their disputes'" (alteration in original)

---

[8] In fact, the Arbitration Clause itself demonstrates that the parties knew exactly how to deploy this phraseology where they intended it. (See June 13, 2008, FA ¶ 20 ("Disputes which shall be subject to binding arbitration shall include but shall not be limited to: (i) the amount of payment for or deduction from Franchisee's or Franchisee's driver's voucher payments; (ii) any monetary fine assessed against a Franchisee or Franchisee's driver . . . or (iii) any claim for discrimination of work offered to Franchisee or Franchisee's driver." (emphasis added)).)

(quoting <u>Dean Witter Reynolds Inc. v. Byrd</u>, 470 U.S. 213, 221 (1985); <u>Stolt-Nielsen S.A. v.</u>

<u>AnimalFeeds Int'l Corp.</u>, 559 U.S. 662, 683 (2010))).

      Furthermore, this Arbitration Clause contrasts sharply with analogous provisions in cases

where courts found that nonsignatories were bound to arbitration through broad contractual

language. For example, in <u>Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.</u>, 9 F.3d 1060

(2d Cir. 1993), the relevant contract required arbitration of "any Dispute or any other

disagreement concerning this Agreement," which governed the use of the name "Deloitte." <u>Id.</u>

at 1062 n.2. The contract defined the term "Dispute," which the parties agreed did not apply in

that case,[9] but it did not define "any other disagreement." <u>Id.</u> at 1063. Nonetheless, the

arbitration clause provided that because it was "not practicable to foresee all factual situations

which could cause interference with the permitted use of the name Deloitte," it was "desirable to

have a vehicle for private resolution of problems or disputes which might arise . . . for

implementing the intent and purposes of this Agreement, and for otherwise reducing tensions

that might arise." <u>Id.</u> at 1063 n.2, 1065 (alteration in original). As a result, the court noted that

the agreement was a "broad-ranging document that regulates the use of the name 'Deloitte'

---

[9] The plaintiff in <u>Deloitte</u>, Noraudit, was originally a regional affiliate of DHSI, a global accounting firm structured as an international association of its worldwide affiliates. 9 F.3d at 1061. In 1989, DHSI decided to merge with another international accounting organization, TRI, by instructing the two companies' regional affiliates to negotiate local mergers. <u>Id.</u> Noraudit, however, was unable to negotiate an agreement with the Norwegian affiliate of TRI, Forum Touche Ross, which was ultimately selected as the Norwegian affiliate of the combined entity. <u>Id.</u> In 1990, after DHSI settled litigation related to the withdrawal of DHSI's former U.K. affiliate after the merger, DHSI entered into an agreement on behalf of its member firms, which gave the former U.K. affiliate and DHSI's member firms limited use of the name "Deloitte." <u>Id.</u>

Although it was not selected as the regional affiliate of the new entity, Noraudit continued to use the name "Deloitte" in its accounting practice in Norway. <u>Id.</u> After Noraudit filed suit seeking, among other things, declaratory relief establishing its right to use the name "Deloitte," the U.S. affiliate sought to compel arbitration pursuant to a clause in the 1990 agreement, in which Noraudit was actually named as a regional affiliate. <u>Id.</u> at 1061-62. Although Noraudit had not signed the agreement, the Second Circuit held that Noraudit was bound by the arbitration clause under an estoppel theory because it received the agreement, failed to object to its terms, and "knowingly accepted the benefits of the Agreement through its continuing use of the name." <u>Id.</u> at 1064. The contract's definition of "Dispute," however, did not apply, since it covered only those controversies "which might arise between DHSI's former U.K. affiliate on the one hand, and DHSI, DHSI's new U.K. affiliate, or any DHSI member firm on the other hand." <u>Id.</u> at 1063.

internationally and, necessarily affects all those who use the name." Id. at 1065. Further noting the agreement required arbitration "of both 'Disputes' and 'any other disagreement concerning [the agreement]," id. (emphasis in original), the court concluded the phrase "any other disagreement" was "a broad one, reasonably covering all controversies regarding use of the name 'Deloitte' that might arise among the many entities whose rights and duties were affected by [the agreement]." Id. Accordingly, the court applied the presumption in favor of arbitration in holding that "any other disagreement" included within its scope a dispute between a signatory and a nonsignatory. Id. ("The heart of [the agreement] was the use of the name 'Deloitte' not just by the principals who were the actual signatories but also by the member firms, including [the nonsignatory].").

The district court cases cited by Defendants in support of binding third-party beneficiaries to broad arbitration agreements they have not signed are similarly inapposite. See Alfa, 857 F. Supp. 2d at 407 (dispute with nonsignatory governed by clause providing that "[a]ll disputes or differences arising out of the interpretation of this Agreement shall be submitted to [arbitration]"); Kairy, 2012 WL 4343220, at *1 (same, for "any controversy arising out of this Agreement"); Life Techs. Corp. v. AB Sciex Pte. Ltd., 803 F. Supp. 2d 270, 272 (S.D.N.Y. 2011) (same, for "any dispute, controversy or claim arising out of, relating to or in connection with this Agreement or any other Transaction Document"); Best Concrete Mix Corp. v. Lloyd's of London Underwriters, 413 F. Supp. 2d 182, 186 (E.D.N.Y. 2006) (same, for "any dispute under or in connection with this insurance").

In this light, the language used in this Arbitration Clause may in fact be sui generis. Nonetheless, the strong presumption in favor of arbitration is overcome in this case because the Clause is plainly not susceptible of an interpretation that it applies to claims or controversies

20

between a Franchisee and the driver of a Franchisee. See Paramedics, 369 F.3d at 653. The contract clearly contemplates three separate parties: (1) the Company, (2) the Franchisee, and (3) the driver of Franchisee. (See June 13, 2008, FA ¶ 20.) The Arbitration Clause, however, only provides for arbitration of claims or controversies between (1) and (2), or between (1) and (3). The fact that this provision explicitly identifies these two sets of disputes, and excludes the only other possible dispute—claims or controversies between (2) and (3)—is strong evidence of the contracting parties' intent to limit the scope of the Arbitration Clause accordingly.

Additional language in the Arbitration Clause further indicates this limitation was not an accident or coincidence. For example, the Arbitration Clause excludes certain claims that might otherwise fall within its scope. It notes, "This section shall not apply to any claim or cause brought by the Company to enforce a non-competition agreement between the parties herein or between the Company and a driver of Franchisee, or to any termination of this Agreement, or to any suspensions of an individual's right to operate the Franchise as a driver." (June 13, 2008, FA ¶ 20 (emphasis added).) The Arbitration Clause also sets forth certain procedures governing disputes within its scope, which emphasizes an intent that only certain sets of parties be required to arbitrate claims. Specifically, the Clause provides that:

> The procedure to be followed by the Franchisee or Franchisee's driver with respect to [certain disputes] shall be the following: in each instance, Franchisee or Franchisee's driver shall first submit such claim or controversy to Director of Franchise Relations of the Company and if the aggrieved Franchisee or Franchisee's driver is not satisfied by the decision of the Director of Franchise Relations of the Company, then Franchisee or Franchisee's driver shall submit the same to binding arbitration . . . . In any arbitration hereunder each party shall bear its own expenses, including legal fees; provided, however, that in the event Franchisee or Franchisee's driver recovers more than two-thirds of the amount in controversy, the Company shall reimburse Franchisee's or Franchisee's driver's filing fees but no other expenses or fees.

21

(Id. (emphasis added).) This frequent and repeated reference to arbitration between the Company and the Franchisee or the Company and the Franchisee's driver, along with the other language of the provision, clearly establishes "positive assurance" that the Arbitration Clause is not "susceptible of the interpretation" that it includes claims or controversies between the Franchisee and the Franchisee's drivers. Paramedics, 369 F.3d at 653.

Not only is the present dispute between Plaintiffs and Defendants explicitly excluded from the scope of the Arbitration Clause, but there is also no permissible reading by which it is even implicitly included. First, Defendants do not—and apparently could not—maintain that they represent the alter ego of GTT, such that any dispute between Defendants and their drivers would fall within the definition of a claim or controversy "between the Company and the driver of Franchisee." (See June 13, 2008, FA ¶ 7 ("The Franchisee is and shall remain an independent contractor and shall not be deemed to be an employee, partner, co-venturer, or agent of the Company.").)

Second, the provision of arbitration for disputes "between the parties herein" cannot be read to include cases between Franchisees and their drivers. (See id. ¶ 20.) While the FAs do not define the term "parties," one such contract, for example, begins by indicating that the FA is "made . . . by and between Golden Touch Transportation of NY, Inc., a New York corporation (the 'Company'), . . . and LOKEKO INC., a New York corporation (hereinafter referred to as the 'Franchisee') . . . ." (See id. at 1.) In addition, only representatives of GTT and Lokeko signed the contract. (See id. at 16.) Moreover, the plain language of the Arbitration Clause itself does not permit "the parties herein" to be construed to include the Franchisee's drivers. If it did, a dispute "between the parties herein" would include a dispute between the Company and the driver of Franchisee; this would render the second phrase in the qualification—"or between the

22

Company and the driver of Franchisee"—entirely superfluous, an interpretation that is discouraged under the governing law. See ReliaStar, 564 F.3d at 88 ("[U]nder New York law, an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible (quoting Galli v. Metz, 973 F.2d 145, 149 (2d Cir. 1992))). As a result, the court has no doubt that the only permissible construction of "the parties herein" is that it refers to the Company and the Franchisee, and not the Franchisee's drivers.[10]

Accordingly, the Arbitration Clause is not susceptible of an interpretation that it applies to a controversy between a Franchisee and the drivers of that Franchisee—Defendants and Plaintiffs in this case, respectively—despite the strong presumption in favor of arbitration. Therefore, regardless of whether Plaintiffs are in fact bound by the relevant FAs, the scope of the Arbitration Clause does not extend to cover the dispute underlying this particular action.

\*       \*       \*

Since the court has determined that the claims or controversies at issue do not fall within the scope of the Arbitration Clause, there is no need to consider Plaintiff's remaining arguments: that FLSA claims are not arbitrable more generally; that the arbitration agreement is unconscionable; and that Plaintiffs cannot be compelled to arbitrate individually. (See Opp'n at 4-15.)

---

[10] While the contract also indicates that "[t]his FA shall inure to the benefit of and be binding upon the parties named herein and their respective successors and assigns" (see June 13, 2008, FA ¶ 15 (emphasis added)), Defendants do not suggest in any way that Plaintiffs may be considered their "successors and assigns." In fact, in the context of this litigation, Defendants seek to distance themselves from Plaintiffs, arguing that Plaintiffs are independent contractors, and not employees. (See Dergunov Decl. ¶ 5.) Moreover, the FA itself establishes the means by which a Franchise may be assigned; there is no evidence that any such process was carried out here. (See June 13, 2008, FA ¶ 6.3.)

**III.   CONCLUSION**

For the reasons set forth above, the court finds that regardless of whether Plaintiffs are bound to the FAs as third-party beneficiaries, the scope of the Arbitration Clause contained within those FAs does not include the claims at issue in this case.  As a result, Defendants' motion to compel arbitration is DENIED.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
     March 23, 2015

NICHOLAS G. GARAUFIS
United States District Judge